WILLS v. SCRANTON COLD STORAGE CO.

(Circuit Court, M. D. Pennsylvania. July 14, 1906.)

No. 8.

**1. PATENTS—INFRINGEMENT.**
    Upon the question of infringement the structure itself is to be looked to and not the results obtained, except as they may go to the question of identity, and infringement is not avoided because the patented device is not utilized to the full extent possible nor because a feature is retained which might be dispensed with to advantage and which it was one of the purposes of the patented device to render unnecessary.
    [Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 370–376.]

**2. SAME—INVENTION—UTILITY AS EVIDENCE.**
    The utility of a patented device is not necessarily a proof of invention.
    [Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 39, 52.
    Utility, extent of use, and commercial success as evidence of invention, see note to Doig v. Morgan Mach. Co., 59 C. C. A. 620.]

**3. SAME—PATENTABLE INVENTION—WHEN NOTICE TAKEN OF WITHOUT PROOF.**
    Even though the point is not made in the proofs that the device does not disclose patentable invention, it is not to be disregarded when it is plain.
    [Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 35, 543.]

**4. SAME—INVENTION.**

The Wills reissued patent No. 12,300 (original No. 742,540) for a refrigerator building, the essential feature of which is a device to prevent drafts up and down elevator shafts in such buildings, 'is void for lack of invention, the advantages being so manifest and the means used for obtaining them so obvious that only mechanical skill was required to supply them.

In Equity. Suit for infringement of reissued letters patent No. 12,300 (original No. 742,540) for a refrigerator building, issued January 3, 1905, to James Wills. On final hearing.

Herbert Knight, for complainant.
Ralph L. Levy, for defendants.

ARCHBALD, District Judge. The question of infringement is not difficult. The patent is for a device to prevent drafts up and down elevator shafts in cold-storage buildings. It is not exactly so expressed, but that is the substance. To accomplish this, flexible strips or flaps, extending beyond the edges of the elevator carriage at top, bottom, and sides, are set about the front or face, left open for the reception and delivery of goods, which close up the intervening spaces and make a comparatively tight fit with the shaft at all times. This is the precise character of structure employed by the defendants which thus to all intents and purposes infringes. It is claimed, however, that infringement is avoided, because the defendants retain, between the cold-storage chambers and the elevator, the anteroom or vestibule, which according to the specifications, it is the object of the invention to dispense with. The doing away with an anteroom, with the consequent saving of place for additional cold storage, and the removal of the musty and unwholesome conditions which are thereby entailed, are no doubt advanced by the inventor as among the advantages of his invention, and form a part of the grounds which prompted it. But the benefits which reside in or flow from it, are not to be confounded with the device itself, nor is infringement escaped because it is not utilized to the extent which it might be, or a feature retained which could, with profit, if desired, be dispensed with. The structure, in other words, is to be looked to, and not the results obtained, except as they go, perchance, to the question of identity; and an elevator shaft, made air-tight by means of flexible or extensible edges, plus a dispensable anteroom, just as much infringes upon the patent as one with the anteroom left out. Nor is this changed by the fact that the elevator carriage so equipped is spoken of in the patent as a traveling anteroom, and the flexible edges, as providing a vestibule, both being merely functions of the devise, existing as well in the one structure as the other.

The real question in the case is whether the device shows patentable invention. No point of this, it is true, was made in the proofs, but there was at the argument; and it lies too plainly on the surface to be disregarded. As already stated, the alleged invention consists simply and essentially in providing flexible edges about

the elevator carriage which adapt themselves to the sides of the shaft, and so close the spaces necessarily left open between the two. The problem to be met, having regard to the state of the prior art is thus explained in the specifications:

"Heretofore in refrigerating plants and cold-storage buildings it has been customary, where elevators were employed to convey merchandise from one floor to another, to provide a vestibule or anteroom between the elevator-shaft and the coldrooms in order that the cold air in the latter compartment should not escape up or down the elevator-shaft while the entrance thereto was open. This escape of the cold air was made possible because the cab did not fit the shaft and the shaft-openings with sufficient closeness to prevent a free and extensive movement of air at and around its sides or edges and also because during the rush hours of business the doors between the rooms were often left open. To obviate these difficulties as much as possible, the anteroom was provided as a sort of air-lock or buffer, and the space so employed was by reason of the shifting temperature rendered useless for storage, and was consequently a loss of space. This room was also by reason of the differing temperatures wet and musty and always unsanitary."

The means employed to obtain this, and the advantages derived therefrom are stated as follows:

"My present invention is designed to utilize this space and make it clean and wholesome and, in fact, to absorb the space in the general storage-room and make the cab a traveling anteroom, and to this end I make the cab practically air-tight, except the open face or faces or fronts, and provide flexible flaps, which bridge over and between the edges of the cab and the corresponding opening in the elevator-shaft and provide a vestibule. The result will be that while the cab is discharging or taking on goods the air in the adjoining room cannot escape through or around it. The room and space heretofore rendered unavailable for storage purposes can thus be utilized. In the employment also of the old form of anteroom as an air-lock or buffer it implied and required a double handling of the goods. It constituted an intermediary room only. This room in connection with my invention I eliminate and dispense with and absorb into the general storage-room. Air-locks are established by merging the air in the elevator-car and each floor when they are thrown together in my present invention."

And again:

"It will be seen that my invention not only prevents the cold air from rushing out, which has always been a source of substantial loss, but it also prevents an inrush of warm and moisture-laden air. This warm air is not only harmful in itself, but deposits snow, which is very undesirable. * * * The intent and purpose of my invention, as will be seen, is to establish an air-lock or a system of air-locks by means of the traveling anteroom and the openings from the elevator-shaft, and this air-lock is accomplished whether the cab or car is provided with one opening or whether it has two or more openings. In each and every instance or embodiment of my invention the air-lock is to be established when the opening of the traveling anteroom registers with the opening in the elevator-shaft."

"It is to be understood," says the inventor, defining the scope of his invention, "that where in the specification and claims I employ the term 'air-lock' I refer to and call for any means for preventing the escape of air from the cooled room to any other place than into the elevator-car which is opening into that particular cooled room at the time—that is to say, the bodies of air in the said cooled room and the said elevator-car or traveling anteroom at the particular time when the two stand opposite each other and the door between them is opened merge and become one body of air, and any passage of such body of air beyond these compartments will for the time being be rendered impossible —and, as above stated, I employ the expression 'air-lock' as applying to this condition. This cab or car becomes and operates as a traveling anteroom."

The quotations thus made from the specifications show the exact character of the invention and insure that no injustice is done it. The patent has six claims, all of which are relied upon. It is conceded, however, that the first may possibly be too broad, comprehending, as it does, every means by which an air-lock, so-called, is established between the elevator cab and the different floors or rooms of the warehouse. But without dwelling upon that, the objection goes deeper and applies to all. Given the problem set forth in the specifications, the question is whether it involved inventive skill to close the air spaces about the elevator carriage and cut off the draft up and down the shaft with adjustable flaps or edges not far removed in character from ordinary weather strips. To this, as it seems to me, there can be but one answer. It is not the simplicity of the means adopted that condemns it; many valuable inventions are most simple. But the disadvantages to be overcome are so manifest, and the means for doing this so obvious, that it does not rise above the level of ordinary mechanical skill to perceive and supply them. Almost any one, in other words, could appreciate the trouble, and practically any carpenter could remedy it. It did not require the peculiar insight of an inventor. It is not as though there had been previous unsuccessful efforts by others to overcome the difficulty, or other prior and more primitive devices which were supplanted. It might be different, also, if an ingenious form of adjustable flap, such, perhaps, as the spring-actuated sidepieces of the defendants, were in question. The whole ingenuity claimed for the device resides in the idea of closing up the air spaces about the carriage by means of edges sufficiently flexible not to interfere with the running of it, and at the same time leave no crevices. Undoubtedly the device is useful. But utility is not necessarily a proof of invention. Daylight Glass Co. v. American Prismatic Light Co. (C. C. A.) 142 Fed. 454. And I can find none here. It is a delicate matter to declare a patent void for want of patentable invention, but in the view taken no other course seems to be open to me.

The bill will be dismissed with costs.