WISCONSIN COMPRESSED AIR HOUSE CLEANING CO. v. AMERICAN COMPRESSED AIR CLEANING CO.*

(Circuit Court of Appeals, Seventh Circuit.   October 7, 1903.)

No. 953.

1. PATENTS—INFRINGEMENT—CARPET CLEANING MACHINES.

The Nation patent, No. 521,174, for a duster, adapted to the cleaning of articles or goods having a nap surface, covers a machine in which a current of compressed air is directed at right angles against the surface of the article to be cleaned from a pipe having a nozzle some distance from such surface and within a hood which envelopes it except for an opening opposite the outlet to permit the air current to come into contact with the goods, and terminating at the other extremity in a cloth sack or strainer which retains the dust while permitting the air to escape. The Thurman carpet renovator, made in accordance with the Thurman patents, Nos. 634,042, 663,943, and 665,983, consists of a machine for cleaning carpets on the floor, in which there is a pipe having an expanded nozzle, the lips of which are substantially in the plane of the bottom of the machine, through which a current of compressed air is forced at an angle of 45 degrees through the carpet, striking the floor, and, being deflected up through the carpet into a hood with a strainer which is carried in front of the nozzle. *Held* that, in view of the prior art, which disclosed stationary machines for renovating carpets by the use of compressed air, movable machines for dusting carpets by means of air currents in connection with hoods and strainers and the open blast nozzle used for dusting carpets and upholstered articles, the Nation patent was not for an invention of a primary character, and was not infringed by the Thurman machine.

Appeal from the Circuit Court of the United States for the Eastern District of Wisconsin.

This appeal is from a decree enjoining the Wisconsin Company from infringing letters patent No. 521,174, June 12, 1894, to Enoch Nation, assignor, the property of the American Company.

Figure 2 of the drawings is here reproduced:

Fig. 2.

The specification and claims read thus:

"Be it known that I, Enoch Nation, a citizen of the United States, residing at Indianapolis, in the county of Marion and state of Indiana, have invented certain new and useful improvements in dusters; and I do hereby declare the following to be a full, clear, and exact description of the invention, such as will enable others skilled in the art to which it appertains to make and use the same.

"This invention relates to improvements in mechanism for cleaning carpets, velvets, furs and goods of any kind having a nap surface and will be found specially useful in dusting upholstered goods such as car seats, the object of the invention being to utilize compressed air as the active agent in liberating the foreign particles, and to provide means for straining the dust

* Rehearing denied November 18, 1903.

out of the air and retaining it while allowing the air to escape after it has been used.

"The objects of this invention are accomplished by the mechanism illustrated in the accompanying drawings, in which—

"Figure 1 is a view in perspective of my complete duster and showing the method of applying it in dusting a car seat. The condensing pump and the chamber for the condensed air are not shown. Fig. 2 is a detail in vertical section of the device, in which the direction of the air is shown by the arrows. Fig. 3 is a detail showing an under side view of the head of the device where the air comes in contact with the goods to be cleaned.

"Similar letters refer to like parts throughout the several views of the drawings.

"A is a metallic tube which will serve the double purpose of an inlet through which the air to operate the duster will be conducted to the nozzle, B, and as a handle by which the duster will be guided over the material to be cleaned. This tube may be bent in any desired shape that will best conform to the special work to be done, such as being curved upwardly for a device for dusting carpets, instead of being made straight as shown in the drawings.

"A1 is a flexible connection, preferably a rubber hose, by means of which the tube, A, will be placed in communication with an air tank, so as to be supplied with air through the hose from the tank. The air will be condensed into the receiver or tank by means of a pump suitably arranged and connected.

"A2 is a valve in the tube, A, by means of which the supply of air may be cut off or the amount of supply regulated.

"B is an expanded nozzle or head terminating the outer end of the tube, A, and is provided with the transverse opening, b, on its under side, arranged so as to give a direct downward course to the stream of air that will be allowed to escape through the opening under heavy pressure. The air thus liberated and coming violently into contact with the nap of the goods to be cleaned dislodges every particle of dust and dirt, which in dusters of this class has been simply thrown into the air by the action of the current only to settle down again upon the goods afterward. To obviate this, which is one of the principal features of my invention, I provide the hood, C, to envelop the nozzle on all sides, but so arranged as not to interfere with the free passage of the dust laden air as it leaves the goods. The hood will be made of any suitable material—as sheet metal—and shaped so as to guide and conduct the current of air with its impurities into a cloth sack, D. This cloth sack will act as a strainer by allowing the air to pass through its meshes but retarding the dust and foreign matter, which will not be able to pass through, and will be accumulated within the sack. As shown in the drawings, the sack is removably secured to the hood by having the contracted portion, c, of the hood, C, projected into the open mouth of the sack and the sack retained by means of an impinging rubber band, d, or by simply tying the sack upon the hood with a cord. When it is desired to empty the accumulated dust, the sack is removed and the contents emptied.

"Having thus fully described my invention, what I claim as new, and wish to secure by letters patent of the United States, is:

"(1) The combination with an air-pump hose or a hose connected with a tank of compressed air and a nozzle terminating said hose and means for regulating the escape of air through the nozzle, of a hood enveloping the nozzle and having an opening opposite the outlet in the nozzle through which the compressed air may be brought into contact with the goods to be cleaned, and an outlet from the hood terminating in a strainer, by which the impurities may be deposited and collected in a body and the air allowed to escape.

"(2) The combination of an air-pump hose or a hose connected with a tank of compressed air and a nozzle terminating said hose and means for regulating the escape of air through the nozzle, of a hood enveloping the nozzle and having an opening opposite the outlet in the nozzle through which the compressed air may be brought into contact with the goods to be cleaned, and having an outlet from the hood terminating in a strainer, said strainer consisting of a cloth bag removably secured to the discharge outlet of the hood, substantially as described and for the purposes specified."

Before the patent was issued, Enoch Nation assigned to William E. Nation. On October 15, 1901, William E. Nation assigned the patent to Frank J. Matchett, and he, having organized the American Company for the purpose, transferred the patent to that corporation on December 12, 1901, and this suit was begun on the 16th of the same month. None of the owners of the patent in suit ever developed it commercially.

The Wisconsin Company is a licensee of the General Compressed Air House Cleaning Company. The latter is located at St. Louis, owns patents Nos. 634,042, 663,943, and 665,983, dated respectively October 3, 1899, December 18, 1900, and January 15, 1901, all issued to John S. Thurman, and since December, 1899, has been engaged successfully in making and using carpet renovators, under the Thurman patents. In September, 1900, Matchett, who organized the American Company 14 months later, procured the organization of the Wisconsin Company to use the Thurman carpet renovators, made by the General Company. And it was while Matchett was secretary of the Wisconsin Company that he picked up the Nation patent and formed the American Company. The General Company, licensor, defended this suit.

Complainant's expert identified the following drawing of the alleged infringing device as being correct in all essentials:

Evidence of the prior art included exhibits of the "open blast nozzle"; British patents to Lake, No. 676, 1870, to Norris, No. 4,538, 1876, to James, No. 4,931, 1878, to Sörensen, No. 3,134, 1892; United States patents to Miller, No. 288,720, 1883, to McClain, No. 365,192, 1887, to Warsop, No. 407,309, 1889, to Ethridge, No. 434,178, 1890; and modified machines of the McClain and Sörensen patents, made by defendant, and claimed to represent correctly the essential principles respectively embodied in those patents.

The open blast nozzle has been in use since 1886. It comprises the combination of an air-pump hose or a hose connected with a tank of compressed air and a nozzle terminating said hose, and means (a cock) for regulating the escape of the air through the nozzle. The orifice in the nozzle is straight, and is from 10 to 16 inches one way by $1/100$ to $1/32$ of an inch the other. It is extensively used by railroad companies in cleaning cars. The removable seats and carpets are taken out of the car and subjected to the blast. The windows and doors of the car are left open and the blast is used in blowing

the dust from the backs of the seats, from the window ledges and curtains, and from the ventilators along the ceiling. In cleaning the plush cushions the blast is usually held close to or against the surface. In cleaning ledges and ventilators the blast is effective some feet away.

The specification of the Lake patent states that the "invention consists in mechanism for producing a draft or current of air to take up the ·dust and dirt (from carpets), and carry the fine particles into a porous air chamber which allows the air to escape while the dust is retained therein." In the machine's base, which bears upon the carpet to be cleaned, is an opening through which the dust is taken by a suction draft created by a fan revolving in the casing and discharged into a cloth bag fastened to the outlet of the casing. The fan is driven by means of two pulleys, a band, and a crank in the hand of the. operator.

In Norris's specification it is said that: "This invention relates to a dust-removing machine for carpeted apartments or surfaces, so constructed that the surface shall not be subject to a rubbing or frictional action, but be lightly but sharply beaten to raise the dust at the same time that a strong current of air shall be produced so as to take up and deposit the light dust and heavier particles of the sweepings in a suitable bag or dust receptacle attached to the sweeper." A hood, the edges of which bear upon the carpet, envelops the beating and blowing elements. Mounted on a horizontal shaft, revolving within the hood, are flexible arms, some carrying beaters and others fan blades. Attached to the outlet of the hood is a bag to receive the dust-laden air and retain the dust while the air passes out through the meshes of the cloth. The fan and beaters are driven as in the Lake patent.

The James patent states that it is an improvement upon the Norris in certain particulars, but, as affecting the present case, the machines are essentially identical.

The Sörensen machine was designed primarily for gleaning grain from fields, but the specification asserts that "it may also be used in collecting and removing dust and dirt from streets, floors, carpets, and the like." "The machine operates by forcing an air jet or current through air channels and through an air-shaft furnished with apertures or outlets. The air current is led through these outlets to the ground beneath the lower part of a grain or dust trunk, the lower end of said trunk passing closely over the surface, where the particles are lying, the other end being connected with a reservoir, into which the particles are carried by the air jet." In the form most elaborately described, air jets are thrown against the ground obliquely and opposite each other so that each aids the other in forcing the particles from the ground into the trunk or hood. In one form described there is a single straight jet, thrown against the ground obliquely towards the front of the trunk; and while, of course, the lower edges of the trunk are "sufficiently elevated to admit of the machine's passing over the ordinary irregularities of such surface," the front edge is provided with a "hinged guard, adapted to drag over the surface to be cleaned." It is also suggested that, "if it be desired to isolate the air current from the external air, such protection may to a certain extent be obtained by applying some elastic bottom linings." The machine as built for a grain gleaner cannot be taken into a house. Defendant exhibited a modified Sörenson machine of the size of the ordinary carpet sweeping devices. As the surface to be cleaned was not irregular, the front edge of the hood was not hinged, and instead of elastic bottom linings the edges of the hood were made to rest flatly upon the carpet. For the "sieve" in the reservoir was substituted a bag. The air jet was supplied from a tank of compressed air. This modified Sörensen machine performed all the service that can be obtained from the device of the Nation patent.

The Miller patent illustrates a stationary machine to which the carpet is taken and cleaned by air jets that are supplied by "a fan or other blower."

The McClain machine consists of a casing or hood having an opening in its under side. To the front edge of the casing is attached an adjustable brush, designed to loosen the dust or dirt. Within one part of the hood is a fan that is rotated by pulleys, a band, and a crank in the hand of the operator. The air, as compressed by the fan, is forced through a conduit and discharged against the carpet at an angle of about 45 degrees. As the dust-laden

air rises within the hood, it revolves a light drum, the lower edges of which touch the water in a pan. The wet drum is intended to catch the dust and deposit it in the pan. The air finally passes out of small apertures in the back of the hood, which may strain out dust not caught by the drum. Defendant exhibited a modified McClain machine, in which the air current was taken from a tank of compressed air, and in which, to illustrate claim 2 of the Nation patent, a bag was substituted for the apertures in the hood as the air strainer. This modified McClain machine performed all the service that can be obtained from the device of the Nation patent.

The Warsop patent exhibits a stationary machine for cleaning carpets with compressed air. "For this purpose we cause a powerful current of compressed air, divided either into a number of small jets or one or more extended jets or sheets of air, to be thrown onto the carpet or other fabric to be cleansed and purified in such a manner that the air is forced completely through the interstices of the carpet or other fabric, and thereby carries with it the dust or other impurities that may be in the carpet into a receptacle made to receive them, and from which they are drawn away by a flue, fan, or other means. The carpet or fabric during the operation is drawn by hand or other suitable means over a revolving perforated roller, the curved surface of the roller opening temporarily the interstices of the carpet, and more freely allowing the dust and impurities to be forced out by a powerful current or currents of compressed air from the supply pipe and nozzles or slots placed immediately over this roller." The perforated roller revolves within a casing through which the carpet is passed.

The Ethridge patent is for a street-sweeping machine. It discloses a combination of "an air-forcing apparatus" ("preferably a blower of any suitable type") operated by means of a gas engine on the carriage, an air pipe or conduit communicating therewith and arranged to deliver jets or blasts of air upon the surface to be cleaned in such a manner as to loosen and set in motion the particles to be removed, a hood or casing over the area on which the débris is loosened and agitated by the air blast, an air-exhausting apparatus to assist in moving the particles from the hood through a passage to a receptacle, from which the air is let out through a screen.

The propositions which defendant advances for reversal of the decree may be summarized thus: (1) Equity will not protect the naked legal right to use a patented invention. The patentee will be protected only in the actual commercial use of his device. As Nation and his successors never introduced the device commercially, there is no equity in the case. (2) Matchett, organizer of both companies, while secretary of defendant bought the Nation patent, and conveyed it to complainant for the purpose of harassing defendant. Equity should discountenance this. (3) Noninfringement. (4) Anticipation. (5) Lack of invention.

Paul Bakewell, for appellant.
E. H. Bottum, for appellee.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

As the decree will be reversed for other reasons, we deem it unnecessary here to agitate the first and second questions.

I. The respective experts agree in defining a duster as that which sweeps dust away from a surface, and a renovator as that which restores to freshness throughout; and the distinction is justified by the lexicographers. Nation classified his device as a "duster," and stated that his invention "relates to improvements in mechanism for cleaning carpets, velvets, furs, and goods of any kind having a nap surface, and will be found specially useful in dusting upholstered goods, such as car seats." Referring to the drawing, the specifica-

tion says: "B is an expanded nozzle or head terminating the outer end of the tube A, and is provided with the transverse opening, b, on its under side, arranged so as to give a direct downward course to the stream of air." Thus the air comes "violently into contact with the nap of the goods to be cleaned." "The direction of the air is shown by the arrows" in the drawing. The hood, C, is made "to envelop the nozzle on all sides, but so arranged as not to interfere with the free passage of the dust-laden air as it leaves the goods" and is conducted into the strainer, "cloth sack, D." Looking to the drawing and specification, it seems clear that Nation had in mind a mechanism for dusting nap surfaces, consisting of an expanded nozzle through whose orifice, held above the surface, a blast of compressed air could be directed down upon the nap of the goods to be cleaned; a hood that completely enveloped the nozzle on all sides, except that, to enable the air blast from the inclosed nozzle to be thrown down against the nap, an opening was made in the bottom of the hood, directly opposite the orifice of the nozzle, through which opening in the bottom of the hood the air blast could reach the goods to be cleaned; and a strainer to release the air and retain the dust. And the claims, as we read them, do not purport to cover any broader invention. The only difference between the two claims is that the general strainer of claim 1 is replaced by the specific cloth bag of claim 2. Both claims describe an essential element as being "a hood enveloping the nozzle and having an opening opposite the outlet in the nozzle through which the compressed air may be brought into contact with the goods to be cleaned." That is, the hood completely envelops the nozzle on all sides, except that, to enable the air blast from the inclosed nozzle to be thrown down against the nap, an opening is made in the bottom of the hood, directly opposite the orifice of the nozzle, through which opening in the bottom of the hood the air blast may reach the goods to be cleaned.

Thurman's patents refer to his device as a carpet renovator. It is designed to renovate carpets without removing them from the floor, by directing a blast of compressed air into and through the carpet against the floor at an angle of about 45 degrees, so that the blast rebounds from the floor and passes at the angle of reflection through the carpet and into a hood and strainer. Referring to the drawing of the alleged infringing machine, without detailing other differences in construction between this and the device of the Nation patent, it will be noted that the forward lip of the nozzle's orifice rests upon the carpet and is in the plane of the machine's base. Except for convenience of manufacture, the nozzle, instead of being cast in one piece with the hood, might be made separately and bolted to the outer wall of the hood. The air is discharged into and through the carpet outside of the hood, and reaches the hood by reason of being deflected forward at an angle from the floor, and is aided in this course by the forward lip's being narrower than the rear lip of the orifice. If the nozzle, the orifice being in the same location relative to the hood as now, were directed rearwardly at an angle of 45 degrees, the air, as the machine moved forward, would escape under the rear lip, up-

through the carpet, into the room. As it is, the air escapes under the forward lip, up through the carpet, into the hood.

The Thurman machine that was put in evidence by the complainant has the forward lip rounded up so that it is one-sixteenth of an inch above the plane of the base. But the scratches made upon its surface show that the forward lip came in close contact with the carpet. And the complainant's expert testified that there was no difference in principle between the machine as exhibited and the machine of the drawing. In this conclusion we agree. Furthermore, the record shows that before the trial the licensor, who is defending this suit, was making his machines so that the forward lip of the orifice was in the plane of the base.

Nation did not disclose that his air blast would penetrate the carpet, strike the floor, and carry up through the carpet the dust on the floor and in the body of the carpet into the hood. His drawing indicates that the air rebounds from the surface of the goods to be cleaned. But if his device, without material modifications, could be made to do the work of the Thurman machine, it would be by a different mode of operation. If Nation's air blast penetrates the carpet and rebounds from the floor, it is an incident, and not an essential, of the device's operation. The air is discharged within the hood. It is true that the height of the orifice above the plane of the base is left by Nation to the builder's discretion. But it is an essential condition that the orifice be within the hood, and opposite (which cannot be in the same plane with) the opening in the base through which the air blast reaches the carpet. In Thurman's machine it is an essential condition of operation that the air be discharged into and through the carpet outside of the hood. It reaches the hood only after striking the floor and passing up through the carpet.

Unless the wording of Nation's claims be ignored, we think the Thurman machine, in which the nozzle is not enveloped within the hood, cannot be held to infringe.

It should not be forgotten that the defendant was operating under later patents, and that the art prior to Nation discloses stationary machines for renovating carpets by the use of compressed air, movable machines for dusting carpets by means of air currents in connection with hoods and strainers, and the "open blast nozzle." In this connection the observation of the Supreme Court in Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23, 23 Sup. Ct. 521, 47 L. Ed. 689, is pertinent:

"Considering the complainants and Whitney (patentee of defendant's machine) as alike having improved on the prior art, the question is whether the specific improvements of the one actionably invaded the domain of the other. The presumption from the grant of the letters patent is that there was a substantial difference between the inventions."

2. Respecting anticipation it is true that the combination of elements in Nation's claims is not found in any one prior device. So the citations are not effective to disprove the novelty of Nation's combination. But the modified Sörensen and McClain machines would be anticipative, and, in our opinion, it did not require invention to produce these modified machines. The modification con-

sisted in substituting the known means for directing an air current from a tank of compressed air upon the goods to be cleaned for the Sörensen and McClain air currents from blowers. This selection among known means, though increasing the degree of efficiency, did not rise to the dignity of independent invention. Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 485, 20 Sup. Ct. 708, 44 L. Ed. 856; Lumber Co. v. Perkins, 25 C. C. A. 613, 80 Fed. 528; Kelly v. Clow, 32 C. C. A. 205, 89 Fed. 297, and cases there collated.

3. It is evident that the defendant's machine cannot be brought within Nation's claims without giving them the character of a primary invention of means for using compressed air in conjunction with a hood and strainer.

The claims comprise the following elements: (1) An air-pump hose, or a hose connected with a tank of compressed air; (2) a nozzle terminating said hose; (3) means (a valve is the means disclosed) for regulating the escape of air through the nozzle; (4) a hood enveloping the nozzle, and having an opening opposite the outlet in the nozzle, through which (opening) the compressed air may be brought into contact with the goods to be cleaned; (5) a strainer (generic in claim 1, and the specific cloth bag in claim 2).

We have already stated our conclusion that the fourth element, without disregarding the language employed, cannot be accepted as a generic description of a hood. But, if the words could properly be given a generic scope, the claims would be void for want of invention.

The first three elements are an exact description of the old "open blast nozzle." The fourth and fifth, if treated generically, cover the hood and strainer of the old Lake, Norris, and James patents. Nation, in testifying to his discovery, showed that he was employed for several years by railroad companies in cleaning cars, and used the "open blast nozzle" for that purpose; and that one day, a piece of burlaps having caught on the nozzle, he observed that the dust was strained out as the air passed through the fabric. Certainly, Nation was not, as is now claimed for him, the discoverer "of the function of air under high pressure as an active agent for thorough cleaning when the full benefit of the rebound current of air was obtained." Nation's machine brings together means for performing two functions—the function of raising the dust, and the function of catching and holding the dust after it is raised. The two functions are not interactive; not even synchronous; but successive. For discharging the first function Nation employed a blast of compressed air, the use of which for that purpose was old and commonly known. If there is any difference in getting "the full benefit of the rebound," it lies in favor of the old "open blast nozzle"; for, to the extent of the back pressure within the hood and strainer, the blast, discharged within the hood, is retarded in striking and in rebounding from the surface from which the dust is to be raised. For discharging the second function Nation employed (on the present hypothesis of a generic claim) the old hood and strainer of the English patents. Certainly he was not the discoverer of the function of the hood and strainer in catching and holding the dust that has been raised by an

air current. So the question is whether a claim of primary invention lies for bringing these two old devices into a union in which each performs only its old function. The authorities answer in the negative.

A cupola furnace being old, and it being old to use a cinder-notch in a blast furnace, there was no invention in putting a cinder-notch in a cupola furnace to perform the same function it had in a blast furnace. Vinton v. Hamilton, 104 U. S. 485, on page 492, 26 L. Ed. 807.

Rice did not prove himself an inventor by combining the return flue of a Cornish boiler with the Morey straw-feeding device, which had been used with a common form of return flue. Heald v. Rice, 104 U. S. 737, on page 755, 26 L. Ed. 910.

It did not require invention to couple an engine, which had theretofore been used in turning a windlass, to a capstan, which had theretofore been operated with handspikes. Morris v. McMillin, 112 U. S. 244, 5 Sup. Ct. 218, 28 L. Ed. 702.

A claim based on combining a relief valve with a steam fire engine, when similar relief valves had been used on engines in steamships, was held to lack invention in Blake v. San Francisco, 113 U. S. 679, 5 Sup. Ct. 692, 28 L. Ed. 1070.

A fireplace heater was old. A fuel magazine in a base-burning stove was old. The quality of invention did not inhere in the act of coupling the fuel magazine to the fireplace heater. Thatcher Heating Co. v. Burtis, 121 U. S. 286, on page 294, 7 Sup. Ct. 1034, 30 L. Ed. 942.

To age wine by applying heat being old, there was no invention in heating it with an apparatus that had never before been used for this purpose, but had been used for heating other liquids. Dreyfus v. Searle, 124 U. S. 60, 8 Sup. Ct. 390, 31 L. Ed. 352.

A claim for a process of spreading a known composition on paper to form a surface, in view of other patents showing that it was old to coat paper with other substances, was held void, in Underwood v. Gerber, 149 U. S. 224, 13 Sup. Ct. 854, 37 L. Ed. 710.

In Kokomo Fence Machine Co. v. Kitselman, 189 U. S. 8, 23 Sup. Ct. 521, 47 L. Ed. 689, the question was whether Kitselman had made a primary invention in producing a portable fence machine that was capable of weaving a diamond mesh wire fence in the open field. A prior machine, stationary in a factory, produced diamond mesh wire fabric for fencing. Another prior machine "walked" along in the field as it wove a wire and picket fence. "Kitselman converted the stationary into a portable machine by setting it on end and mounting it on a truck. * * * Whatever its merits, it was not in itself primary invention to mount a machine for making diamond mesh on a truck, and using it in the field as the old machine had been used to make wire and picket fence. The getting up and walking was not new, though the machine may have gone at a better gait and made a better fence."

And the cases might be multiplied indefinitely.

The decree is reversed, with the direction to dismiss the bill for want of equity.