EDISON ELECTRIC LIGHT CO. v. NOVELTY INCANDESCENT LAMP CO.

(Circuit Court of Appeals, Third Circuit. February 16, 1909.)

No. 3, October Term, 1908.

1. Patents (§ 328*)—Invention—Incandescent Lamps.

The Edison reissue patent No. 12,393 (original No. 444,530), for a leading-in wire for incandescent lamps, in which the joint between the exterior copper wire and the interior platinum wire is sealed within the glass, which both effects a large saving of platinum and greatly strengthens the joint, was not anticipated, and discloses invention. Also, *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 26*) — INVENTION—CORRECTION OF MISTAKEN IDEA—USE AND AR-
RANGEMENT OF MATERIALS.

While the correction of a mistaken idea entertained by the art, amount-
ing to the mere recognition of a mechanical truth, may not be an inven-
tive act, invention may be found in a new structure, involving a read-
justment of materials in use, by which new and highly beneficial results
are brought about. Daylight Manufacturing Company v. American Pris-
matic Light Company, 142 Fed. 454, 73 C. C. A. 570, distinguished. Rain-
ear v. Western Tube Company, 159 Fed. 431, 86 C. C. A. 411, followed.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig.
§ 26.*]

3. PATENTS (§ 26*) — INVENTION—REARRANGEMENT OF MATERIALS—REVERSAL OF
STRUCTURE.

Where, therefore, in incandescent electric lamps, already in use, an in-
ner copper or bronze section of the leading-in wire, supporting the filament,
was extended down into and sealed up in the glass neck, where the union
with the intermediate platinum section was made, the union of the latter
with the exterior copper section being outside the glass, in view of the
difficulties of the problem as·shown by the efforts of other inventors and
the resulting advantages thereby secured, it involved invention to reverse
this structure and extend the outer copper section into the glass, making
a union with the platinum there.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 27–30; Dec. Dig.
§ 26.*]

4. PATENTS (§ 52*)—ANTICIPATION—ACCIDENTAL REALIZATION OF STRUCTURE.

A merely accidental occurrence, realizing the structure of a patent, not
only not appreciated, but actually made the ground of rejection as an im-
perfection, does not amount to an anticipation.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 70; Dec. Dig. §
52.*]

5. PATENTS (§ 65*)—ANTICIPATION—MISTAKEN FIGURE IN PRECEDING PATENT.

Neither is it an anticipation that by a mistaken showing in the figure
of a preceding patent, by the error of the draftsman, the structure of the
patent appears contrary to the conception of the inventors and the reading
of the patent.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 65.*]

Appeal from the Circuit Court of the United States for the West-
ern District of Pennsylvania.

For opinion below, see 161 Fed. 549.

Richard N. Dyer and John Robert Taylor, for appellants.

A. Parker-Smith, for appellees.

Before DALLAS and GRAY, Circuit Judges, and ARCHBALD,
District Judge.

ARCHBALD, District Judge.   The patent in suit is for a leading-
in wire for incandescent electric lamps.   It was taken out by Thomas
A. Edison, January 13, 1891, but, being found to be too broad, a
reissue was obtained October 10, 1905, and it is on this that the suit
is based.   Infringement is admitted, the validity of the patent being the
only question.

The leading-in wire of an electric lamp conducts the current to
the filament within the bulb, and having to be sealed in, air-tight, where
it enters the bulb, in order to preserve the vacuum within, a metal must
be employed whose coefficiency of expansion is as near as may be to

that of the glass, or at least the particular kind of glass used, so that the two shall contract and expand together, the filament burning up if there is the slightest leakage. Platinum is found to be the best for the purpose, but being very rare and expensive, economy is enforced, and the smallest possible amount, both in length and size of wire, which will insure a perfect seal, is therefore to be employed. It is quite ductile also, and liable to stretch in consequence, which tends to impair the seal, requiring it to be relieved of strain. The exterior ends of the wire have also to be rigid so that they will not sag and short-circuit, and the union of the platinum with the exterior copper section must be so secured as to avoid, so far as practicable, the breakage incident to handling in manufacture. These were the problems which confronted the inventor, and which he undertook to solve by the device of the patent.

    There are two forms of construction shown but with only one are we concerned. In this there is an inner section of the leading-in wire of platinum, connecting at one end with the filament and sealed into the glass at the other, and an outer section of copper to which the platinum is joined, the point of union being within the glass into which the copper section is led and sealed. The other construction had inner

terminals of copper between the platinum and the filament, but was in other respects the same, and while admittedly the preferred form with the inventor, and employing the smallest amount of platinum, was found to be objectionable and was given up. The validity of the patent depends on whether, in contrast with the prior art, invention is so shown.

There is a suggested anticipation, because in practice, in other forms, such as the Heisler and Bernstein lamps, in which the exterior copper section is not led into the glass, it sometimes happened that the glass, by mistake, ran down on to and over the point of union with the platinum, thus realizing, as it is said, the construction of the patent. But no such accidental and fugitive occurrence is of account. 30 Cyc. 840. Not only was it not understood or appreciated, but it was actually made the ground of rejection, the lamp, when it happened, being regarded as imperfect and thrown out. It thus gave nothing to the world, standing in the way of discovery, indeed, instead of promoting it, and is thus entitled to no consideration here. Equally ineffective is it to urge that the Edison construction is disclosed by the Lemp and Wightman patent (401,444), where, by an error of the draftsman in one of the figures, the outer section of the leading-in wire is apparently made to extend into the glass. The inventors had no such conception, and no one reading the patent would get any idea of it, if, indeed, he would not perceive and correct the mistake. To accept it, under the circumstances, as a disclosure which advanced the art, anticipating the present invention, would reflect on the judgment of the court.

The patentability of the device is the real question. It was denied by the court below, on the ground that all the inventor did was to correct the mistaken idea entertained by the art, that, if the exterior or copper end of the leading-in wire was extended into the glass, it would crack the glass, and thus ruin the seal, and that recognition of this mistake was a mechanical truth and not an inventive act, for which no patent would lie. But that does not fairly state the case in all its parts. It is not like the condition in Daylight Manufacturing Company v. American Prismatic Light Company, 142 Fed. 454, 73 C. C. A. 570, as supposed. The method there pursued already appeared in the prior art, and its application to the production of rolled prism plate based on the discovery that, contrary to the conceived idea, such plate could be successfully annealed and cut, was properly held to involve no invention, the mechanism by which it was accomplished being essentially old. The prevailing opinion being that it was a useless product, the discovery that it was not, which was all that there was, could not be regarded as rising to the dignity of invention, nothing new for effecting it having been devised. But the structure on which invention is predicated here is unquestionably new, there being a readjustment of materials, by which new and highly useful results are brought about. The case in many features is like that of Rainear v. Western Tube Company, 159 Fed. 431, 86 C. C. A. 411, in which invention was found, although there was nothing more than a rearrangement of materials in common use to produce a nonrusting pipe-union joint. Indeed, the case here is stronger than that, for the principle of which

advantage was taken in that case, that brass and iron in contact would not rust, was well known; whereas, here, electric lamp makers labored under the impression that the imbedding and sealing in of the exterior copper section of the leading-in wire, which is of the essence of the invention, would crack the glass. Mr. Edison no doubt discovered that this was not the fact, and that the copper section could be so successfully sealed up. But, however important to it, that is not the whole invention, which is not to be so limited or classed, not to say that it is to be condemned, even if that should prove to be the case.

In what, then, does the claim to patentability consist? The prime object of the invention was the saving of platinum, and to this, in consequence, the mind of the inventor was particularly addressed. It is so declared in the specifications, and in every way stands confessed. This object was a worthy one, justifying the exercise of, if not engaging, the inventive faculties, platinum being a very precious metal, and the extent of its use entering largely into the cost and ultimate price of the lamp. And in this respect the success achieved was certainly most marked, the length of the platinum section being reduced to not exceeding an eighth of an inch, as contrasted with two-thirds to three-quarters of an inch in other lamps, and there being also a material reduction in the size of the wire, the money so saved amounting to from $20,000 to $30,000 a year in the complainants' practice. It may be that, in the previous Edison patent (248,419) in one of the figures (4), a still greater economy of platinum is shown. But this, for some reason, was not a commercial success, and, the whole device being involved in any such comparison, it is with other lamps which have proved a success that contrast is the rather to be made.

Invention might well be made to rest on this alone, but economy in platinum is by no means the only benefit attained. When the platinum extends outside the glass, it is subject to a pulling strain, to which, being ductile, it is liable to yield, and being drawn out and reduced in size in this way, it shrinks away from the glass, impairing the seal. But by anchoring the outgoing copper in the glass, the strain on the platinum is removed, and with it the danger of leakage, insuring a practically perfect seal. It is because of this that with less platinum there are better results. It is said that, as an offset, the copper brings in gas bubbles. But none are observable about the platinum, and it is there that they particularly count, and, whatever theorizing as to this may be indulged in, it is established by the evidence that, with the copper extended into and sealed up with the glass, a greater percentage of perfect seals is secured, and theory must yield to proof.

Another important feature is the rigidity obtained in the outgoing wires. If these sag, there is a danger of short-circuiting, destroying the lamp, which not infrequently occurs where the platinum extends beyond the glass. Stability is also required, the breakage of the wires in handling in course of manufacture being a not inconsiderable source of loss. Both of these defects, however, are remedied, and the corresponding advantages obtained, by carrying the copper into and imbedding it within the seal, the copper ends outside of it not sagging

like the platinum, and an effective protection, both of the platinum and of the copper and platinum union, being afforded thereby.

With all these useful features, which, if not altogether new, are not found united in any previous device, why, it may be asked, is not invention shown? No doubt, the extending of the exterior copper section into the glass is of its essence, being that from which pretty much everything else flows. It is true, also, that the art did not believe that this could be successfully done, being dominated with the idea that it would break the seal. But, as already stated, the invention does not stop with the correction of that mistake. There may be that, but there is more, and, to so confine it, it must appear that the resulting benefits, with that out of the way, were known. It is said that the construction adopted in the patent was obvious from the reverse construction shown in the Heisler and Bernstein lamps, where an inner copper or bronze section, supporting the filament, is extended down into and sealed up in the glass, where the union with the platinum takes place. But it is always hazardous to assert the obviousness of a device which no one, with the whole art before him, up to that time has conceived. Nor were the benefits of the patented structure to be reasoned out, unaided, as maintained. The ordinary explanation, for instance, would be that the more platinum,

*Bernstein Series Lamp*

the better the seal, and not, as demonstrated, that, other things combining, a more perfect seal could be secured with less. The defendants' expert, as it would seem, is not even yet convinced. Neither was it to be supposed that, aside from the question of breakage, the copper, with its greater coefficient of expansion, on being extended into the glass, would somehow hold. Above all, was there nothing in the Heisler and Bernstein construction to suggest a solution by the mere turning of it upside down? The platinum there extended outside the glass, where the union with the copper was formed, with all the resulting disadvantages which it was the object of the present invention to overcome. But it is somewhat difficult to see how, by mere observation, as something lying on the surface, it would be recognized that they would disappear, if only this construction was turned around. It may be, as a mere naked conception, that the reverse construction did not go unobserved. But upon what consideration can it be declared that it was at the same time apprehended that thereupon all the benefits as we now know them (only so that the glass did not crack) would immediately ensue? The fact is, as the record shows, dispelling any such idea, that not a few inventors, including Mr. Edison himself, had for

some time been busied in the effort to secure a satisfactory arrangement of leading-in wires, and the different means taken for doing so, better than anything else, shows the complexity of the problem involved, and that in order to meet it something more than ordinary skill was required. To deny to its successful solution the merit of invention upon the contrary idea is to declare that these efforts were needless, and that there was already disclosed in the art an easy and obvious way out, which ought to have been, but somehow was not, seen. We are not, however, to be persuaded to that view. On the contrary, we think that the successful method of dealing with the subject, and particularly the method here adopted, was inobvious, if not obscure, calling for inventive insight to develop and discern, and that the patent, therefore, should have been sustained.

The decree is reversed, and the bill reinstated, with directions to refer the case to a master to state an account. The patent having expired since suit brought, no injunction will go out.