### PIEPER et al. v. S. S. WHITE DENTAL MFG. CO.

(Circuit Court of Appeals, Seventh Circuit.   October 15, 1915.)

No. 2091.

1. PATENTS ☞72—ANTICIPATION—PRIOR USE.
   A prior structure, to constitute an anticipation by prior use, must be clearly and unmistakably identified with the structure of the patent.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 86–91; Dec. Dig. ☞72.]

2. PATENTS ☞157—CONSTRUCTION.
   Unless it is unavoidable, a patent should not be given a construction that makes the patentee concede a broader and more explicit prior art than existed in fact.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229–232; Dec. Dig. ☞157.]

3. PATENTS ☞328—VALIDITY AND INFRINGEMENT—ELECTRIC MOTOR REGULATION.
   The Pieper and Pieper patent, No. 704,099, for electric motor regulation for alternating current dental engines, was not anticipated, and discloses patentable invention; also *held* infringed.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois; Kenesaw M. Landis, Judge.

Suit in equity by Oscar H. Pieper, Alphonse F. Pieper, and Frank Ritter, doing business as the Ritter Dental Manufacturing Company, against the S. S. White Dental Manufacturing Company. Decree for defendant, and complainants appeal. Reversed.

Appellants failed in their suit to enjoin appellee as an alleged infringer of their patent for "electric motor regulation," No. 704,099, July 8, 1902, on application filed March 24, 1899, by Oscar H. and Alphonse F. Pieper.

"Our present invention," the applicants said, "relates to electric motors adapted for alternating currents and to certain improvements relating to and means for and method of controlling them, whereby they may be started with the necessary torque, and when the armature is under full speed it can be instantly stopped, and, if desired, its direction of movement reversed, without the use of clutches, brakes, or other mechanical holding devices."

"The invention, which is designed more particularly for small motors intended for operating dental engines or machines where accurate speed regulation is the leading requisite, relates to alternating current motors of the direct current type having the usual laminated field magnets and the windings designed for a relatively high electromotive force or relatively high self-induction, armature coils designed for a relatively low electromotive force or having a relatively low self-induction, commutator and commutator brushes arranged at the neutral point, said field and armature windings being connected in series; and the novel features of the invention relate to the control of such motors at any speed and with or without a load by a permanent shunt around the armature, and the accurate regulation of the motor is accomplished by the manipulation of a variable resistance interposed in said shunt."

Eight claims are stated in the patent and involved in the suit. No distinctions between the claims are insisted upon by the parties respecting either the validity of the patent or infringement. Claim 2 may be taken as typical:

"2. The combination in a motor for alternating currents, of field windings with relatively high self-induction and armature coils with relatively low self-induction, commutator and commutator brushes arranged on the neutral

point, all connected in series, as customary in continuous current motors, and a variable resistance in shunt with the armature."

In a prior suit against another alleged infringer, both the District Court (Pieper v. Electro Dental Mfg. Co. [C. C.] 156 Fed. 672) and the Court of Appeals for the Second Circuit (Id., 160 Fed. 930, 88 C. C. A. 112) held that no invention was required to produce the new combination.

This appeal was first presented to Baker, Seaman, and Mack, Circuit Judges. Appellants contended that new evidence gave a changed complexion to the issues. On behalf of the court Judge Seaman delivered an opinion in which the new evidence was held not to differentiate substantially the present from the New York case, and the decision in that case, without repeating the grounds thereof, was indorsed.

A petition for rehearing raised in the minds of the members of the court who joined in that opinion grave doubts respecting their apprehension of the true nature of the problem that confronted the patentees, and also respecting their having given due weight to evidence in the present record that was not adduced in the New York case. The petition was granted, the decision and opinion were set aside, additional briefs were received, and the questions were argued fully before Baker, Seaman, and Kohlsaat, Circuit Judges. Preparation of a new opinion was committed to Judge Seaman. But death intervened, and the cause is now taken on resubmission without further oral argument.

Charles A. Brown, of Chicago, Ill., and Robert S. Taylor, of Ft. Wayne, Ind., for appellants.

Edward Rector, of Chicago, Ill., and Henry N. Paul, of Philadelphia, Pa., for appellee.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

BAKER, Circuit Judge (after stating the facts as above). Appellee's expert essayed some distinctions between appellee's dental engine and the device of the patent; but the contention of noninfringement disappeared at the argument. If the patent is valid, it is infringed.

[1] Prior public use is presented as an additional defense. It is claimed that the Wagner Electric Company in 1891 installed the combination of the patent in the office of a dentist at St. Louis. Nothing physical except a motor was produced in evidence. As introduced it could operate only as a repulsion motor. If oral testimony relating to its original condition 20 years before be accepted to establish its then capacity as an alternating current series motor with brushes on the neutral point to be combined with a variable resistance shunt across the armature, such capacity would not prove that it had been so combined. Both direct and alternating currents led into the dentist's office, and on either the motor could be made to run. There were ways in which a variable resistance could be introduced into the motor circuit besides in shunt across the armature. We find in the oral testimony a failure to give a clear and unmistakable identification of the 1891 St. Louis structure with that of the patent. This defense must therefore be rejected. Deering v. Winona, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153; Emerson & Norris Co. v. Simpson Bros. Corporation, 202 Fed. 747, 121 C. C. A. 113; H. Mueller Mfg. Co. v. Glauber, 184 Fed. 609, 106 C. C. A. 613.

No other anticipation was asserted. There remains the question of invention in producing the new combination.

In the New York case the state of the art and the problem of the patentees were stated as follows:

"At that time (the filing of the application in March, 1899) there were in existence electric motors for dental purposes in all respects, save as to details of windings, the same as the one in suit, operating by direct current. There were also similar motors operated by alternating current, and regulated as to speed by frictional attachments. There were also small motors for alternating current, in which there was no regulation of speed, and which had the precise construction of laminated field and differing windings of field and armature that the patentees described. These were used as fan motors. * * * The direct current dental motors gave entire satisfaction and were capable of accurate and complete control in the manner indicated. It was not until alternating current came into extensive use that there was a demand for any other motor. When that time came, it was necessary only to apply to the small fan motors the regulating shunt with varying resistances which was already in successful use in direct current motors, without changing or modifying either element of the combination. Did this constitute invention? Would the means employed for regulating the alternating current motors, so that their speed would be controlled when operating with or without load, be obvious to one skilled in the art?"

Expert and counsel for appellee similarly limit the problem now. But on the present record it seems to us that such a statement of the problem is hardly broad enough. An electrical engine to meet satisfactorily the requirements of dentists had to have these capabilities: Of starting promptly on the closing of the circuit; of having several steps of speed, from about 1,000 revolutions a minute for the lowest step to about 4,000 for the highest; of maintaining at each step a substantially constant speed and energy either with or without load; of prompt reversal of direction; of equally efficient operation in either direction; and of instant stoppage. Such a dental engine for direct current was produced and on the market in 1893, 1894 and 1895. At least as early as 1896 many cities and towns were supplied with alternating current and that alone. Dentists in those places, seeing that their brethren in direct current cities were furnished with electrical dental engines, were making demands, and their demands pointed to a market, for alternating current dental engines. When the patentees started to meet this demand, there was then and had been for several years prior thereto quite a number of types of alternating current motors, among them the hysteresis, the repulsion, the induction, the series with the proportion of field and armature windings stated in the patent, and the series without that proportion. So the real problem was to supply the demand for an alternating current dental engine; and in perceiving and achieving the desired result, it was immaterial what prior art motor, if any, contained a partial combination of the total necessary new combination. True, in giving an answer the patentees are now found to have made a new combination, of which a partial combination of elements existed in certain prior fan motors. But whether several answers, one answer, or no answer to a propounded problem be forthcoming, that fact cannot alter the problem.

Nevertheless, if the given answer was obvious, the new combination was unpatentable.

Appellee puts on the patent a reading by which the patentees admit that an alternating current series motor with strong field and weak

armature was usual and customary among alternating current motors when they attacked the problem of designing an alternating current dental engine. No claim was made by the patentees of having invented an alternating current series motor of the specified relations of field and armature. Invention was stated in both specification and claims to consist of a new combination that produced a new and useful machine, namely, the combination, in an alternating current series motor, of field windings with relatively high self-induction, armature coils with relatively low self-induction, commutator, commutator brushes arranged on the neutral point, and a variable resistance shunt across the armature. By formulating only combination claims, the patentees, of course, admitted that the elements and various subcombinations thereof were old or open to common use. But a case in which an alternating current series motor with strong field, weak armature, and brushes on the neutral point stands as the usual and customary structure at the time the patentees were seeking to produce an alternating current dental engine, is one thing; while a case in which such a motor stands as one of many types of alternating current motors, and appears only as a relic long discarded from the field of use, may be quite another.

[2] Unless it is unavoidable, a specification should not be given a construction that makes the patentee concede a broader and more explicit prior art than existed in fact. And so the adjective "usual" in the second paragraph of the specification quoted in the statement of the case should be confined to "laminated field magnets," a method of building that accorded with the teachings of the art, and should not be carried forward to describe as customary the field windings having relatively high self-induction and the armature coils having relatively low self-induction, an arrangement that, although found in some prior fan motors, was counter, as will hereinafter appear, to the art's teaching of what was efficient in alternating current series motors.

[3] Patents of Davidson, No. 503,453, August 15, 1893, of Johnston, Browne and Davidson, No. 511,621, December 26, 1893, and of Richardson No. 523,444, July 24, 1894 (all owned and used by appellee in its dental supply business), and the prior public use of outfits made and sold by appellants, proved that the art possessed direct current engines that successfully met the requirements of dentists. Garhart's patent, No. 621,241, March 14, 1899, for an "electrical controller," showed a variable resistance, a rheostat, in shunt across the armature of a direct current motor. Patents of Siemens, No. 504,630, September 5, 1893, and of Offrell, No. 520,800, June 5, 1894, demonstrated that the armature of a direct current series motor could be made to revolve by alternating current, and that some of the troubles caused by the change of current could be obviated by laminating the field magnet. Westinghouse, Stanley, Holtzer-Cabot, and Wagner, each for a year or two between 1891 and 1895, built and marketed a few small desk fans (from 100 to about 2,000 each) that were operated by alternating current series motors having fields of relatively high self-induction and armatures of relatively low self-induction.

It is therefore obvious, so the argument runs, that an electrical engineer, skilled in the motor art, if called on in 1897, 1898, or 1899 to produce an alternating current dental engine, either would have taken the existing direct current dental engine and laminated the field magnet and proportioned the ohmic and live resistances in field, armature, and rheostat so as fully to meet the requirements, or he would have coupled the Garhart controller and, say, the Westinghouse fan motor. (This latter was done for illustrative purposes by appellee's expert. But Garhart testified that the controller so used had been changed from the condition in which he had put it on the market. Appellee's expert claimed that this modified union of Garhart and Westinghouse had all the characteristics of a successful dental engine; but the dentist with whom the experiments were performed was not produced. Oscar H. Pieper, one of the patentees, testified that this illustrative combination would rotate a dental drill, but failed to meet the known requirements of a dental engine; and the dentist with whom he worked verified the results. We might concede for the purposes of this case that an electrical engineer, versed in the motor art, if directed in 1899 so to do, might have modified Garhart and Westinghouse and proportioned them to each other in a way to produce a successful dental engine; and the question would still remain whether the direction so to do came from knowledge and skill of the art or from inventive thought and experiment.)

Fortification of the argument is alleged to be found in Morris v. McMillin, 112 U. S. 244, 5 Sup. Ct. 218, 28 L. Ed. 702, and similar cases, many of which are collated in Wisconsin Co. v. American Co., 125 Fed. 761, 60 C. C. A. 529. McMillin made the first steam-operated capstan. He did it by coupling a steam engine, which had theretofore been used in turning a windlass, to a capstan, which had theretofore been operated with handspikes. Was this an obvious thing to do? Yes, the court said, because it is the same engine doing the same work in the same way. But if there had been inherent differences between the rotativeness of a windlass and of a capstan, if the continuous force in one direction applied through the driving wheel of the steam engine would not work, or if there were valid reasons in mechanics to believe that it would not work, on a capstan in the same way as did the continuous force in one direction applied through the handspikes by the muscles of the seamen, then possibly the court might have doubted that the examiner was wrong in allowing the patent, and might have resolved the doubt by considering evidence in respect to the extent and persistency of the demand for steam-operated capstans, the unsuccessful efforts of others to meet the demand, and the history of the development of McMillin's device.

In looms and lathes the mechanical elements are old; the new combinations can be sensed by eye and hand; and the movements of parts can be made so slow that the courses and effects of the mechanical energy can readily be followed. But in considering the courses and effects of electricity and magnetism we are in the presence of the mysterious and intangible. Answering a cross-examining "How?" appellants' expert replied that:

"The ultimate 'how' could not be answered without a full knowledge of the ultimate constitution of electricity and magnetism, which thus far is beyond the range of human knowledge."

Appellee's expert, speaking in another case of the difficulties of producing a motor that would work effectively on alternating current, said:

"No one not familiar from actual experience with the state of the art at that time can possibly appreciate the difficulties encountered and the obscure character of the phenomena involved. Apparatus designed with the utmost care failed to give the results expected of it, often exhibiting characteristics quite the opposite of those intended; and the intangible character of the agent employed, together with the tremendous rapidity of its vibrations, made it extremely difficult to trace to their true causes the various phenomena observed." [1]

Westinghouse Electric Mfg. Co. v. Allis-Chalmers Co. (C. C. A., 3d Cir.) 176 Fed. 362, 100 C. C. A. 408, dealt with a patent for converting direct into alternating current. Defendant insisted that, inasmuch as the elements, a rotary converter and an auxiliary exciter, were old, the device of the patent was a mere assembling of those appliances, which did not involve invention. In rejecting the contention, the court, among other things, said:

"When we know that in its different phases electricity may affect, or be affected by, metals and appliances in different ways and with wholly different results, we must guard against being misled by the mere superficial resemblances of the appliances and machines used in connection with it; for from an electrical standpoint the real significance of such appliances lies, not in their material, external appearance, but in their working effect under the influence of diverse electrical factors."

Many obstructive electrical factors were run against in applying alternating current to series motors that were not present in using direct current. They came from the different natures of the currents. With direct there is a steady force in one direction. With alternating the force goes from zero to maximum, changes direction, falls to zero, proceeds to the opposite maximum, changes direction, comes back to zero, and so on in cycles. (Eye and hand are helpless; and the imagination is staggered in attempting to appreciate the results reported by delicate and complicated measuring instruments.) Sixty cycles a second, 120 reversals of direction, were usual; and higher frequencies were not uncommon. At each reversal resistance to the change occurs. This property is called self-induction. It tends to impede the introduction, variation, or extinction of a current passing through a circuit. In an alternating current series motor, the field windings must be designed with reference to the live resistances due to self-induction —the dead resistance of the wire, which alone governs in a direct current series motor, being of relative unconcern; the current and the

[1] Appellee objected to the competency of the expert's affidavit, given in another case, as evidence in this. We attach no weight to it as evidence, but adopt it, in connection with the quotation from the Westinghouse Case, 176 Fed. 362, 100 C. C. A. 408, as a clear statement of a fact that is proven by competent evidence in this case, namely, that in considering patents involving the combination and interaction of electrical forces we should not be deceived by the physical similarities of parts that are differently electrified and magnetized.

voltage of the field windings are out of phase, the current being retarded with respect to the voltage; the magnetism set up in the field magnet also has a slight retardation with respect to the phase of the current; the alternations in the field magnet tend to induce currents in the magnet core; the current through the armature has a retardation with respect to the voltage and also the magnetism of the field; the retardation of the armature current with respect to the phase of the field magnetism causes a reduction of torque, a loss of efficiency of the motor. These and other factors are affected by additional factors when a shunt across the armature is introduced. None of them is to be reckoned with in the direct current series motor.

These differences, encountered in the empirical development of the series motor, led the scholars, teachers, authors, practitioners, and inventors in this art to an understanding that efficiency in an alternating current series motor could best, or only, be obtained by combining a weak field and a strong armature. In this relation it was found that the effects of self-induction could be counteracted in the armature by means not applicable to the field; and so a given current would produce more working power than in other relations. At this point there is a sharp controversy between the experts. For appellee it is asserted (1) that the aforesaid understanding first appeared in the art in a patent to Lamme, No. 758,667, which postdates the labors of the Pieper brothers; and (2) that the exhibited fan motors prove what the prior teaching was. (1) Appellants' expert supports his position by citing Siemens, Eickemeyer, Stanley and Kelley, Hochhausen, Hutin and Le Blanc, Meston, Berg, and Averett, all of whom preceded the Piepers, and by pointing out that Lamme claimed improvement and not discovery of the relation. Counsel also refer to articles by Steinmetz in volume XXIII, page 10, of the "Proceedings of the American Institute of Electrical Engineers" and in his "General Lectures on Electrical Engineering," of later date, but tracing the history back into the 80's. (2) That some of the exhibited fan motors show a relation of strong field and weak armature is a fact; but that fact, in our judgment, does not establish a counter teaching—it merely proves that their makers went, like many men in many fields go, counter to teaching. Wagner Company's engineer, for example, knew better. He desired a stronger armature. But he found it inconvenient so to make an armature three inches in diameter. He was making his motors to operate desk fans, and little power was required. He was making them for ordinary householders, who might not know or care about waste of current and loss of energy, as users of larger sizes of the same motor for street railroads or factories would. Being built counter to correct teaching, naturally they fell by the wayside, were soon superseded for fan purposes by other and more efficient types of alternating current motors, and were found for defense purposes, as the identifying witness of the old Westinghouse fan motor admitted, "lying around in the old junk." Therefore we draw from this record the conclusion of fact that the teachings respecting the alternating current series motor, based on study and experiment and correct practice, and promulgated by the fathers of the art, were as stated at the opening of this paragraph.

PIEPER V. S. S. WHITE DENTAL MFG. CO.

Oscar H. Pieper testified that he and his brother spent more than two years in producing the alternating current dental engine of the patent. They gathered and studied all the publications, treatises, and patents relating to electrical motors. They themselves had had long experience in the art, and had put on the market a highly successful direct current dental engine.

Quite naturally the first thing they did was to try their direct current dental engine on alternating current. It rotated, but they could not make it satisfy the known requirements of a dental engine. Were they stupid? Were they purposely avoiding the obvious? Is the looking backward opinion of appellee's expert a better guide than their forward efforts? In our judgment the testimony of Rowland, professor of electrical engineering and director of the school of engineering at Drexel Institute, settles this point. Somebody, during the pendency of the New York suit, engaged him to demonstrate that a direct current dental engine could readily be modified so as to operate satisfactorily on alternating current. It does not appear who his client was or how appellants learned of his tests. He was brought in by subpœna, reluctant, feeling that it was not in accordance with ethics to testify about experimental work done for a former client. Though not directly stated, two facts are deducible from his testimony: That he was thoroughly versed in the teachings and practice of the electrical motor art preceding the work of the Piepers; and that when he made his tests he was unacquainted with the patent in suit. The first flows from the statements of his qualifications; the latter, from the requirements of his engagement as a proposed test witness. He was furnished a direct current dental engine of appellee's make. It had a laminated field magnet. This type was the one which it is now known could most easily be reconstructed to produce the results of the patent. When asked by his client if he could obtain the requested results, he at once agreed with the position of appellee's expert that of course it could be done. He tried it for three months. Contemporaneous records of his efforts are in evidence. Changes in the number of turns in the field windings were made; wires of different sizes were used; the armature was rewound; and other means of regulation besides the shunt across the armature were tried. He found it "impossible to modify the motor so it could be operated under any practical conditions with alternating current." "When at length I had to relinquish my efforts and acknowledge that it was a very difficult task, I had done everything that seemed to me possible, except to start out on original lines on a fresh design." As his client did not care to have him start out on original lines, his employment was ended.

Pieper brothers next experimented in turn with hysteresis motors, induction motors, repulsion motors. These types were efficient and well known. It seems not unnatural that the Piepers should have included these in their tests. With each they failed to secure by electrical means the regulation required in dental engines. No one has succeeded.

Thereafter they confined their efforts to trying to regulate alternating current series motors. During these experiments Oscar H. Pieper

went to Europe to investigate dental engines. He there found a type which was run by a one-speed induction motor and in which the regulating means were mechanical. Also during these experiments they tried to regulate a small Stanley fan motor. This had a relatively strong field and a relatively weak armature. Built contrary to requirements of efficiency, it had so little power that it would not operate a dental drill under working conditions. But, says appellee, if they had tried to regulate the larger sized Stanley fan motor or the Westinghouse fan motor, they would have attained success at once. Possibly; but the quality of such an act would then have to be determined. Possibly; but if they had hunted farther among the "old junk," they would as likely have spent their efforts on the Excelsior fan motor or the Ft. Wayne fan motor, in which the fields were relatively weak and the armatures relatively strong, and which now in the light of the patent are known to be unregulable for dental purposes. And so they found it necessary, like Rowland, to start out on original lines on a fresh design.

What they were seeking to do at this point was to design a combination of field, armature, commutator, commutator brushes, all connected in series, and a variable resistance in shunt across the armature, that would successfully operate as an alternating current dental engine. When a shunt across the armature is introduced, electrical factors have to be dealt with in addition to those that pertain to a subcombination of the other elements. The shunt modifies the retardation of the armature current with respect to the field magnetism; this modification of the retardation varies with the resistance of the shunt and the speed of the armature; in the armature there is a joint effect of voltage due to the rotation of the armature and of voltage due to the alternating field magnetism which is impressed on the armature; the self-induction of the field and of the armature has a marked influence on the amount of current flowing through the motor; the sum of the voltage measured between the terminals of the field winding and the voltage measured between the terminals of the armature is greater than the voltage measured around the whole motor; the sum of the currents in the armature and in the shunt is greater than the current measured in the field winding; the character of the shunt and the position of the controlling lever affect the divergence of the sum of the currents in the armature and in the shunt from equality with the current in the field winding. These and other factors pointed out by appellants' expert are all absent when a shunt is placed across the armature of a direct current series motor.

Materially there are five elements in the above stated combination; electrically, several times as many. In striving to balance the factors, so as to produce a successful alternating current dental engine, Pieper brothers, besides studying and experimenting, sought advice. Orally and by correspondence they consulted Averett, who was designing motors for the General Electric Company. He conformed to the teachings of the art by advising them to employ a weak field and a strong armature in their design of an alternating current series motor; suggested that they use fewer turns of heavier wire, so as to reduce

the self-induction as much as possible; doubted whether a motor built as he advised could be regulated for dental purposes by a shunt across the armature; and recommended that they insert the shunt in series with the main motor circuit. Another electrical engineer, Reed, gave them no better advice.

It was only by casting aside the teaching of the art and by disregarding the counsel of contemporary experts that they built the device of the patent. It was only by working away from efficiency in alternating current series motors that they obtained a regulable dental engine; and finally they so balanced conflicting factors that they obtained the necessary control. It may be easy now to see that, if a variable resistance shunt is applied to an armature of relatively high self-induction, changes of position of the controlling lever will so magnify the differences of phase, self-induction, mutual induction, and their consequences between the weak field and the strong armature that at each change of speed the device becomes in effect a different structure; while, if applied to an armature of relatively low self-induction, changes of position of the controlling lever will so minify the differences of phase and other conflicting factors between the strong field and the weak armature that the device always remains practically the same, with respect to both uniformity of speed within the different steps either with or without load, and constancy of torque at the different speeds. But the Piepers were the first to perceive that result either in imagination or in concrete form. And so we believe that in achieving the result the Piepers as electrical engineers had first to be informed by the Piepers as inventors. International Tel. Mfg. Co. v. Kellogg, 171 Fed. 651, 96 C. C. A. 395. Invention of a combination does not lie in gathering up the elements that are employed, but consists in first perceiving (through study or experiment or accident) that a new and desirable result may be attained by bringing about a relationship of elements which no one has before perceived and then going forth to find the things that may be utilized in the new required relationship. Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, —— C. C. A. ——.

That the discarded fan motors, so much relied on by appellee, may be shown to contain a part of the new combination of the patent, does not affect the merit of Piepers' discovery. Relationship in them of strong field and weak armature was accidental, or at least purposeless, except for cheapness and convenience of manufacture. Their makers never undertook to introduce a variable resistance shunt across the armature. They never sacrificed efficiency for the purpose of achieving regulability. This accidental or purposeless relation was no bar to the patent. Edison Electric Light Co. v. Novelty Incandescent Lamp Co., 167 Fed. 977, 93 C. C. A. 387; General Electric Co. v. Sangamo Electric Co., 174 Fed. 141, 98 C. C. A. 154.

What were others doing in the meantime to satisfy the demand for alternating current dental engines? Some strivers converted alternating current into direct and applied it to existing direct current dental engines. Others also confessed their inability electrically to regulate alternating current motors and secured changes of speed by mechani-

cal means. One or the other of these methods was adopted by appellee and other manufacturers of dental outfits. These meanderings of rivals, who felt the urge of gain, indicate that the progress of the patentees, instead of being obvious, was away from the open road.

Appellants' device has been a great commercial ·success. So far it has furnished the only answer to the problem. It has been followed in Europe as well as in this country. Imitators have fluttered around its light.

If the facts established by the present record do not affirmatively prove invention, they should at least create a doubt. In the file wrapper it appears that the examiner first rejected the application on references to patents for direct current dental engines, patents demonstrating that series motors of the direct current type could be made to run with alternating current, and patents for rheostats in general, and the Garhart controller in particular. His first impression coincided with the position afterwards taken by appellee. His final conversion should be allowed to operate as live resistance to a reversal of the public grant. Railroad Supply Co. v. Hart Steel Co., 222 Fed. 261, —— C. C. A. ——.

The decree is reversed, with directions to issue an injunction and order an accounting.

