WESTINGHOUSE ELECTRIC & MFG. CO. v. ALLIS-CHALMERS CO.

(Circuit Court of Appeals, Third Circuit. January 20, 1910.)

No. 72.

1. PATENTS (§ 234*)—CONSTRUCTION—ELECTRICAL MECHANISMS.
     In dealing with patents having relation to electricity, an invisible, intangible agency, and in itself of different kinds, which in its different phases may affect or be affected by metals or appliances in different ways and with wholly different results, a court must guard against being misled by the mere superficial resemblances of the appliances and machines used in connection with it; for from an electrical standpoint the real significance of such appliances lies, not in their material, external appearance, but in their working effect, under the influence of diverse electrical factors.
     [Ed. Note.—For other cases, see Patents, Dec. Dig. § 234.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—SYSTEM OF ELECTRICAL DISTRIBUTION.
     The Lamme patent, No. 606,015, for a system of electrical distribution and regulation designed to obviate the variation in speed of a rotary converter with changes in the amount of the inductive load, when converting a direct into an alternating current, is not for a mere aggregation of previously known devices, but discloses invention of decided merit, in view of the fact that the problem of preventing such machines from racing and destroying themselves when such conversion was attempted had been known for several years, at a time when such apparatus was particularly in demand, and that the patentee was the first to devise an efficient means; also held infringed.

3. PATENTS (§ 287*)—INFRINGEMENT—PERSONS LIABLE—CORPORATION CONTROLLING ANOTHER.
     Where one corporation owns or controls absolutely the entire property of another, including its business and good will, and operates its plant and conducts its business as a department of its own business, it is responsible for the acts of such other company, and may be held liable for its infringement of a patent.
     [Ed. Note.—For other cases, see Patents, Cent. Dig. § 457; Dec. Dig. § 287.*]

Appeal from the Circuit Court of the United States for the District of New Jersey.

Suit in equity by the Westinghouse Electric & Manufacturing Company against the Allis-Chalmers Company. Decree for defendant, and complainant appeals. Reversed.

For opinion below, see 168 Fed. 91.

Kerr, Page, Cooper & Hayward (Edwin B. Smith, of counsel), for appellant.

Thomas F. Sheridan and Clifton V. Edwards, for respondent.

Before GRAY and BUFFINGTON, Circuit Judges, and McPHERSON, District Judge.

BUFFINGTON, Circuit Judge. In a bill filed in the court below, the Westinghouse Company charged the Allis-Chalmers Company with infringement of patent No. 606,015, issued June 21, 1898, to one Lamme, for a system of electrical distribution and regulation, and now

owned by it. That court, in an opinion reported at 168 Fed. 91, held that no infringing act on the part of the Allis-Chalmers Company was shown, and dismissed the bill, without discussing the patent questions involved. From such decree the Westinghouse Company appealed. As we have reached the conclusion that under the pleadings and proofs the alleged infringing acts are chargeable to the Allis-Chalmers Company, we turn to a discussion of the patent in question.

When, in the early 90's, the advantages, for transmission and other purposes, of an alternating over a direct current became apparent, there arose a demand for appliances whereby existing electric plants, built to generate direct currents, could convert such direct into alternating currents. This demand, as well as the desirability of at times converting alternating into direct currents, led to the development of rotary converters. Without discussing details, it suffices to say that such converters so coupled a motor and a generator that, when the direct current was the electro-motive force at one end, the other produced an alternating current, and vice versa. This rotary converter was improved from time to time, and when used to convert alternating to direct currents proved satisfactory. On the other hand, when used to transform a direct to an alternating current, the converter proved unsatisfactory, and its dangers were such as to almost prohibit its use. These dangers arose from its erratic actions, in that it would, without warning to or knowledge by the operator, so suddenly and at such high speed begin racing that before the operator could control the apparatus it was liable to destroy itself.

Now the rotary converter, as constructed at the date of the patent, consisted of a motor and a generator, placed side by side on a common shaft, and having a common magnetic field. They had also a common winding connected at different points to the bars of the commutator and to the collecting rings, respectively, so that, when a direct current was led into the coils through the commutator, thus driving the machine as a direct current motor, an alternating current could be taken from the collector rings. But this conversion of direct to alternating current brought into play inductive forces which are not present where a direct current is used for nonconverting purposes. If an inductive load—such, for example, as inductive motors—were thrown upon the alternating current circuit, a demagnetization of the field of the converter resulted, with an attendant increase in the speed of the armature, such as noted above. Now, as this speed-causing factor was without the knowledge and beyond the control of the operator, it can readily be seen that this uncontrolled inductive factor dominated the converter and precluded its use, except in cases, theoretical rather than real, where no variation in the inductive load on the alternating current circuit could possibly occur. Moreover, the result of this inductive force in abruptly changing the speed of the armature and the regularity of the alternating current was objectionable, in that such currents work properly only under a fixed rate of alternation. To counteract this destructive force was Lamme's purpose, and the proofs show that, although such evil was recognized, it was not remedied until he did so near the close of the 90's, and it is significant that no other mode has since been devised.

Turning to the patent, we find Lamme stated his object clearly in these words:

"My invention relates to the transformation of direct currents to alternating currents, and has for its object to provide a method and a means whereby the speed of the rotary transformer employed may be maintained substantially constant, irrespective of changes in the amount of inductive load on the alternating current circuit."

He then states the effects on a rotary converter of inductive and non-inductive loads on the alternating current circuit, to which we have referred, and says:

"Therefore, if the alternating current circuit carries an inductive load—such, for example, as inductive motors—which changes from time to time, the variations in the amount of inductive load will cause variations in the speed of the transformer, which will in turn vary the speed of the motors driven by it."

The patentee then describes his remedial mechanism as follows:

"In order to obviate this variation in speed with changes in the amount of inductive load, I propose to employ a small direct-current generator for exciting the field-magnet of the rotary transformer, which may have either a shunt, a series, or a compound winding, but which must be normally operated to produce an electro-motive force, which corresponds to a degree of field-magnet excitation very much below saturation. This exciting generator is driven either by an alternating current motor, which is in turn driven by current supplied by the rotary transformer, or it is belted directly to the rotary transformer."

And of the electrical action of such device he says:

"If the amount of the alternating current inductive load on a rotary transformer changes, so that the rate of alternating decreases, for example, then the exciting generator and the motor driving the same will also decrease in speed. This action will also decrease the exciting electro-motive force of the rotary transformer, and as the exciter is unsaturated a small drop in speed will produce a relatively large drop in the electro-motive force. This lowering of the exciting electro-motive force will thus weaken the field of the rotary transformer and effect an increase of its armature speed up to near the normal. On the other hand, an increase in speed of the rotary transformer will be accompanied by an increase in the exciting electro-motive force, which will act immediately to lower the speed of the transformer."

But, while Lamme's device was the first to solve the difficulty, it is still contended, inasmuch as the elements of his device, for example, a rotary converter and an auxiliary exciter, were old, that Lamme's device was a mere assembling of these appliances, which did not involve invention. But the fact that the electrical world, with the knowledge of the use of both rotary converter and auxiliary exciter, during the several years the difficulty existed, made no such combination as Lamme's, is highly suggestive that it required more than mere engineering advance of the electrical art to devise the possibility of a use of these old elements in the new and changed relations resulting from the presence of induction motors in an alternating current-circuit. This deepening of the complexity of the problem made more unlikely the possible use of old elements under situations widely different from the theretofore practice. Moreover, when we are dealing with electricity, an invisible, intangible agency, and in itself of different kinds, and when we know that in its different phases it may affect, or

be affected by, metals and appliances in different ways and with wholly different results, we must guard against being misled by the mere superficial resemblances of the appliances and machines used in connection with it; for from an electrical standpoint the real significance of such appliances lies, not in their material, external appearance, but in their working effect under the influence of diverse electrical factors.

Take, for example, the use by Kielholtz of an auxiliary exciter, which is the nearest approach to Lamme. In the first place, Kielholtz's device was addressed to an entirely different problem. He used a wholly different electrical mechanism and secured a wholly different electrical result. Indeed, no one contends his mechanism could be so modified, readjusted, or reconstructed as to do the work of Lamme's. In fact, the two devices were in wholly different electrical fields, and the only thing in common between them was the self-use of rotation to control speed through the well-understood principle of a common steam governor, which increased or decreased the supply of steam as the engine speeded or slowed. This familiar governor principle Kielholtz utilized in an auxiliary motor or exciter, and the value of his device lay, not in the mere use of an exciter, but in the use he made of it to control the electrical conditions with which he dealt. Now his problem·was, with the factor of a fixed electro-motive power of a direct current applied to a motor and a generator, of maintaining unvarying speed whereby the distant lamps of an electric light system would remain constantly and equally bright with those near at hand. He dealt wholly with a direct current. The destructive, disturbing force of induction motors on an alternating current was not involved. There was no danger in any shape from any destructive electro-motive force or speed racing. His motor was driven by a fixed direct current, controlled by a rheostat, and worked on a generator with an individual magnetic field. His object was simply to maintain uniform, not to prevent destructive, speed; for, under his conditions, such speed could not exist. In his device the magnetic field of his generator was self-excited; it was not connected with or affected by the auxiliary exciter, which latter increased or decreased the magnetism of·the magnetic field of the motor alone. Consequently, as the speed of the motor armature tended to decrease, Kielholtz's exciter responsively tended to decrease the opposing magnetism of the main motor's magnetic field, and under this dual decrease tendency of opposing forces of field and armature his motor maintained its former speed.

Now this device, ingenious and effective as it seems, in no way solved or tended to solve the problem to which Lamme addressed himself. For it will be noted that the use of an auxiliary exciter by Kielholtz was in itself no more suggestive to Lamme than the steam governor, for both alike simply addressed themselves to the problem of· maintaining a constant level of speed by making increased or decreased applications of the motive power the governing factor. But this plain and simple application of the governor principle would not avail in Lamme's problem, because there induction on the alternating current circuit introduced an additional disturbing element, which tended to radically disturb the equipoise controlled by a governor. Indeed, as stated by one of the witnesses:

"It was five years subsequent to the discovery that a self-exciting rotary transformer was a dangerous and self-destructive machine before any one made the discovery that its defects could be cured by providing it with an exciting dynamo by itself."

During this period the electric profession tried to solve the problem of a possible safe use of a rotary converter, when converting a direct to an alternating current, but without success. During such experiments at the General Electric Company's works in April, 1893, such a machine speeded up and burst the armature; the experimenting engineer testifying:

"Precautions were taken to guard against accidents; but the inverted rotary speeded up so rapidly that before the man could open the switch connecting it to the course of direct current supply the armature burst. * * * I discussed the matter with other engineers, with the hopes of understanding the phenomenon."

Indeed, the proofs show that a number of accidents occurred during these years, and although, as we have seen, such machines were in great demand in the new practice that had grown up of utilizing old, direct-current systems to convert their currents to alternating ones, manufacturers were averse to furnishing such machines, much as they were called for, and when they did so it was only with full instructions as to the dangers incident to their use. But not only was this new disturbing factor of inductive force thus introduced, but it was made to acutely operate on a single magnet field and simultaneously unbalance the magnetic counterforces of both motor and generator. For the situation was one where not only the magnetic inequality passively caused by decrease in speed must be reckoned with, but also the magnetic inequality actively caused by demagnetization resulting from inductive force in the alternating line, and both these influences, as we have seen, were exerted in a magnetic field common to both the motor and generator of a rotary converter, which latter Kielholtz did not have. With these new factors entering into the situation and the many electrical problems resultant therefrom, it will be seen that the application of the auxiliary motor was a step which involved much more of the inventive faculty than the use of such an exciter did in the device of Kielholtz. If the Patent Office was justified—which presumably it was—in conceding inventive character to Kielholtz, it would seem warranted in regarding as inventive the application of the governor principle by Lamme to a different and more intricate field.

In view, therefore, of the electrical problems which confronted him, we are of opinion that Lamme's work involved invention. The proofs bearing on the difficulties and obscurities the electrical art in rotary converter practice had before it satisfies us that Lamme's problem, far from being a mere adaptation of recognized agencies to accomplish a simple expedient was a complex, obscure electrical difficulty which involved invention of decided merit. We think this well summed up in the frank statement of one of the electrical engineers called by complainant, who says:

"From time to time thereafter other similar accidents were reported, and it was not until 1898, when the patent in suit issued, that any satisfactory solution of the problem was reached, and that inverted rotary transformers could

be produced which would produce the constant frequency and safe operation required. The means set forth by Mr. Lamme furnishes a complete solution of the problem, since it not only prevents the machines from being self-destructive, but also renders them capable of giving the substantially constant frequency so essential for alternating current systems. This means, while simplicity itself as a matter of structure, was by no means an easy one to conceive of, as is shown by the fact that through five years of knowledge of the problem, at a time when the apparatus was particularly in demand, no one else thought of it. Indeed, for my own part, I do not find it easy to understand, even now that I have been familiar with it for many years, and if I did not know to the contrary, I should still be inclined to say, with much positiveness, that the means shown would not work to accomplish the result. I remember very well that after the accident in the power house of the Westinghouse Company, when this invention was applied to prevent its repetition, the fact that it worked to secure that result created much surprise."

We accordingly hold the patent valid.

That the installation in the Merchants' Heat & Light Company at Indianapolis is an infringement is clear, and the only question is whether the Allis-Chalmers Company is chargeable as the infringer. The issues settled by the pleadings establish that the Allis-Chalmers Company owns the controlling majority of the stock of the Bullock Electric Manufacturing Company, which furnished the infringing apparatus but the bill does more than charge such corporate control as might result merely from such majority ownership, and that some of the directors of one company are also directors of the other. These two facts, without more, might be insufficient to establish the proposition that the Allis-Chalmers Company was liable for the acts of the other corporation. But there is more. There is the positive averment that the Allis-Chalmers Company either owns absolutely or controls the entire property of every kind, including the business and good will, of the Bullock Company, and is operating and conducting the plant and business as the electrical department of its own business. In corroborration of these averments it is charged that the Allis-Chalmers Company advertised its entry upon the electrical field, giving as its reason the facts that it has acquired the plant of the Bullock Company, that its own electrical department consisted of or comprised the plant of the Bullock Company, and that its intention was to go on with the manufacture of the Bullock Company's product. Since these significant averments are either admitted in terms, or are only met by the formal denial of control, "save as the Allis-Chalmers Company is lawfully entitled thereto as the holder of such majority of stock," we think the situation justifies a court in acting upon it. The two corporations evidently preserve their separate organizations; but the control of the Bullock Company's business is exercised by the Allis-Chalmers Company, which has taken over all that is valuable in this business and made it a department of its own.

The substance of the matter is that the Allis-Chalmers Company is the unquestioned master, whose orders are obeyed, and we think that under such circumstances a court of equity may well look behind the corporate screen and determine where the real and responsible power lies. It is not a question where the formal legal title to the property rests. The bill avers—and the answer passes the averment over in silence—that even the ownership of the property may have passed,

for it charges that either the ownership of the property has been transferred, or, if not the ownership, at least the control, and the answer confines such denial as is made solely to the transfer of control, and says nothing whatever about the transfer of ownership. But we lay no stress upon the ownership of the legal title to the property. It is enough for the present purpose to note that on the face of the pleadings the power to control, operate, and manufacture is in the Allis-Chalmers Company and is being exercised by that company. In our opinion, therefore, it is liable for the infringing act complained of as being its own act done through a controlled agency.

The decree dismissing the bill, therefore, must be reversed, the bill reinstated, and a decree entered holding the patent valid and infringed.