## WESTINGHOUSE ELECTRIC & MFG. CO. v. RADIO-CRAFT CO., Inc., et al.

(District Court, D. New Jersey. June 29, 1923.)

1. Patents ⬤⟾327—Judgment determining validity binding on party in subsequent suit by assignee.

A patent was res judicata as to a defendant in a suit by an assignee of the patent, where he had also been a party to a previous suit, wherein the patent was adjudged valid.

2. Customs and usages ⬤⟾17—Custom cannot vary unambiguous terms of written agreement.

A custom cannot vary the express and unambiguous terms of a written agreement.

3. Evidence ⬤⟾397(1)—Parol evidence not admissible to vary terms of written instrument.

Parol evidence as to the meaning of the parties to a written contract was not admissible to vary its language, unless it was ambiguous, or did not express the intention of the parties.

4. Patents ⬤⟾213—Absorption of corporation held transfer of license.

Where a corporation took the stock of another corporation, there was a violation of a provision in a patent license agreement against transfer.

⬤⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Radio-Craft Company, Inc., and another. Determination in favor of plaintiff.

Charles Neave, Stephen H. Philbin, and James J. Cosgrove, all of New York City, for plaintiff.

Samuel E. Darby, Jr., of New York City, and Thomas G. Haight, of Jersey City, N. J., for defendants.

BODINE, District Judge. [1] The plaintiff in this suit is the assignee of United States letters patent No. 1,113,149, granted October 6, 1914, to Edwin H. Armstrong, of Yonkers, N. Y., for a wireless receiving system. The patent was adjudged valid in the case of Edwin H. Armstrong and Westinghouse Electric & Manufacturing Co. v. De Forest Radio Telephone & Telegraph Co. (D. C.) 279 Fed. 445, affirmed in the Circuit Court of Appeals for the Second Circuit, 280 Fed. 584. As to the defendant, the De Forest Radio Telephone & Telegraph Company (hereinafter called the De Forest Company), the patent is res judicata. Throckmorton v. Hickman, 279 Fed. 196 (C. C. A. Third Circuit). The defendant the Radio-Craft Company (hereinafter called the Radio Company) is a licensee under the patent; hence no question of validity is here involved.

Armstrong, the patentee, after securing his patent and prior to granting the assignment to the Westinghouse Electric & Manufacturing Company (hereinafter called the Westinghouse Company) granted a number of limited licenses to various persons and corporations, among the latter the Radio Company, a corporation having a small place of business in Brooklyn, N. Y. The license agreement, in so far as pertinent to the disputes here involved, is as follows (the italics are mine):

"3. The licensor hereby grants to the licensee a *nonexclusive, nontransferable license to manufacture the apparatus and to sell the apparatus of the licensee's manufacture*, as follows:

"(a) To *radio amateurs* for use in radio amateur stations.

"(b) To *radio experimenters* and scientific schools or universities, for use in experimental and scientific school or university, radio stations.

"4. The licensor specifically reserves the right to determine whether or not a sale of apparatus by the licensee comes within the category of licensed uses set forth in clause 3, subdivisions (a) and (b), subject, however, in disputed cases, to an appeal to a third party skilled in the radio art, to be designated by both parties and to be agreeable to both licensee and licensor, who shall act as a mediator, and to whom the facts shall be submitted for his decision, and the licensee and licensor hereby agree to accept and abide by his decision.

"5. *For the apparatus manufactured* or *sold* by it *under this agreement* the licensee agrees to pay the licensor five per cent. of the licensee's selling price of apparatus sold *for the uses set forth in clause 3, subdivisions (a) and (b)*, and the licensee agrees that it will not manufacture or sell any of the apparatus to purchasers for purposes other than those set forth in clause 3 hereof."

After the termination of the patent litigation involving the Armstrong patent in the Second Circuit, the De Forest Company, through its officers and employees, acquired all of the stock of the Radio Company, which had, in the meantime, passed into the ownership of Dr.

Edward Weston, of Newark, the well-known electrical manufacturer. The Radio Company did no substantial business until its stock was so taken over. It had earned royalties only in the sum of $29.

· A license agreement with exactly the same terms had been granted by Armstrong to Messrs. Cutting & Washington. The District Court for the Southern District of New York, Judge Mayer sitting, passed upon the license agreement in a contempt proceeding in the suit between the plaintiff here and the De Forest Company, deciding that the agreement had no ambiguity, was clear upon its face, and was limited in the precise way indicated. The colloquy between the court and Mr. Darby is pertinent and persuasive:

"The Court: You see, the point is that the Cutting & Washington people have no right to sell it (the patented article) to somebody who in turn might sell it to these three classes.

"Mr. Darby: But that is the custom; it is the practice. It is the custom in this electrical art, as universally practiced. It is practiced by Armstrong's own licensees.

"The Court: That is not the point. Here is a written instrument which defines their right to manufacture, their license to manufacture and sell, in a very specific way. I do not care what the practice is.

"Mr. Darby: Well, the trade custom; that has something to do with it.

"The Court: You cannot read into a contract a trade custom. The only way you can put custom into a contract is when a state of facts exists, where it is shown that the contract was made in the light of the custom, or where there is some ambiguous phrase. Sometimes, we will say in some merchandising business, the custom is that a yard means a yard and a fraction, you see. There are all sorts of trade customs. Here is a definite, well-defined, and distinct contract between the owner of the patent and his licensee, defining and limiting the uses to which the licensed person may manufacture or sell.

"Now, as I understand it, assuming all the preliminary part to be sound, and assuming that Cutting & Washington can do all the things that you have indicated, if they sold it to you, for instance, for use in a noncommercial land radio station, if you had one, they do not permit the sale of this stuff to anybody but those comprised within the three classes. And they go further than that, and they specifically reserve the right to determine whether or not a sale of apparatus made by the licensee comes within the category of licensed uses, and so on, in disputed cases, to appeal to a third party skilled in the radio art, to be designated by both parties and so forth and so forth. In other words, in order to protect himself, as a matter of contract, Armstrong, the licensor, in his contract with Cutting & Washington said, 'You may manufacture for and sell to only the three distinctly described classes.'"

Between 400 and 500 sets of apparatus involving the patent in suit were, in 1922, purchased by the Radio Company complete from the Reynolds Spring Company. The devices even had metal plates containing the words "Radio-Craft" and "Radio-Phone." No work was done upon these sets by the Radio Company. Further, a great number of other sets were procured from the Reynolds Spring Company and from other manufacturers, which only required a short wiring connection to be made inside. All these sets were sold to dealers and distributors.

[2] The Radio Company's activity with respect to the patent device is limited by the scope of the license. The defendants sought at the trial to introduce evidence to show a custom among manufacturers of radio outfits to purchase parts and to assemble them for the purpose

of reading into the license, which expressly limits the licensee to manufacture and sell apparatus of the "licensee's manufacture," additional terms. Such evidence was declined. Assuming that at the time the license agreement was made the business of radio manufacture was so perfected as to permit of the existence of an established trade custom, such custom could, in no way, vary the express and unambiguous terms of a written agreement.

"A custom is a usage which has obtained the force of law; but, to give it this force, it must be notorious, and have existed long enough to justify the inference that the parties had it in view in making their contract. Adams v. Otterback, 15 How. (56 U. S.) 539, 545, 14 L. Ed. 805. It must be certain and uniform, and not loose and variable. Young v. One Hundred and Forty Thousand Hard Brick (D. C.) 78 Fed. 149; Corcoran v. Chess, 131 Pa. 356, 18 Atl. 876. The existence of such a custom was denied at the argument, and it was apparently abandoned, for it was not discussed in the brief, and its existence rests upon the bare allegation in the affidavit of defense. But the custom, if it exists, cannot avail the defendant. The steel was to be shipped 'at mill's convenience' and when so shipped defendant was to pay '$3.50 cwt. delivered.' These terms are clear and unambiguous. The effect of usage upon the contracts of parties has been decided many times. It may be resorted to in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract.' Moore v. United States, 196 U. S. 157, 166, 25 Sup. Ct. 202, 203, 49 L. Ed. 428; Porter v. Patterson, 15 Pa. 229; Burton v. Forest Oil Co., 204 Pa. 349, 54 Atl. 266." Etna Forge & Bolt Co. v. Youngstown Sheet & Tube Co., 282 Fed. (C. C. A. 3d Cir.) 786.

Counsel also sought to establish a custom among manufacturers of radio apparatus to distribute their product through distributors, dealers, and retailers in order to enlarge the provisions of the license agreement which limits the sale of apparatus of the licensee's manufacture (a) to radio amateurs; (b) to radio experimenters in scientific schools or universities. Undoubtedly the radio business was in its infancy at the time the license agreement was granted. Assuming that under such conditions a custom could have been established, such custom would obviously not be admissible to vary and alter the terms of a carefully drawn and unambiguous instrument of license.

[3] Counsel also sought to enlarge the scope of the license agreement by parol testimony to show the meaning of the parties. Clearly, such evidence was not admissible to vary the terms of the written instrument, unless it was ambiguous or did not express the intention of the parties. Second National Bank v. Columbia Trust Co., 288 Fed. 17 (C. C. A. 3d Circuit). There could be no suggestion of fraud, accident, or mistake in the drafting of the original instrument of assignment, because on June 3, 1921, before any dispute arose, the then treasurer of the Radio Company wrote to the patent attorneys, Messrs. Pennie, Davis, Marvin & Edmonds, as follows:

"We have been unable to move any of our radio apparatus owing to the fact that the amateurs have been doing no buying. Referring to our license agreement under the Armstrong regenerative patent, No. 1,113,149, which was signed September 29, 1920, beg to advise that we were under the impression that this license allowed us to sell radio apparatus to the United States government and to industrial companies for private communication purposes where money is not paid for the messages transmitted. Upon investigating this question we find that our license covers sales only to amateurs and experimenters brought out in paragraph 3 and classified

under classes A and B. We are anxious to sell our apparatus to the United States government and industrial companies for private communication purposes, and hope that you will amend the inclosed contract accordingly. We understand that other licensors are permitted to sell their apparatus to the classes mentioned, and under the circumstances see no reason for not being granted our request. We wish to bid on apparatus which comes under these questionable classes without delay, and respectfully request an amendment to the contract by bearer."

Judge Mayer decided that the terms were not ambiguous, and learned counsel for the defendant, in seeking to enlarge the agreement, is forced to add additional words to express a different meaning. Courts do not rewrite contracts. The Radio Company has violated its license agreement, in that it has sold devices not of its manufacture, admittedly covered by the patent, to persons other than (a) "radio amateurs for use in radio amateur stations," and (b) "radio experimenters and scientific schools or university, for use in experimental and scientific school or university radio stations." As to the Radio Company, plaintiff is entitled to relief.

The Radio Company's business activity with respect to the subject-matter of the patent is the business activity of the De Forest Company. Officers and employees of the De Forest Company own the entire stock of the Radio Company, and acquired it after the Radio Company had abandoned its business and after litigation had resulted adversely to the De Forest Company with respect to acts that it was doing in violation of the patent and in collusion with Cutting & Washington, the holder of a precisely similar license agreement, and also after officers of the De Forest Company, witnesses in the present suit, had been specifically told by Judge Mayer, in open court, the scope of the license agreement.

[4] The De Forest Company, in taking the beneficial use of the stock of the Radio Company, had actual notice of the very limited character of the license. The officers of the De Forest Company obviously acquired the stock of the Radio Company as a cloak under which the De Forest Company might operate the Radio Company and so acquire the benefits of a nontransferable license. The Radio Company's corporate entity has been preserved. The De Forest corporation has not permitted the legal title to the stock of the Radio corporation to become vested in itself, although the beneficial use is vested in it. Corporate books are kept; pay rolls are kept; a little-used check book is occasionally employed. The Radio Company's place of business is the place of business of the De Forest Company. When the Radio Company moved into the De Forest plant, its sign was displayed. The officers of the Radio Company are the officers and employees of the De Forest Company. The Radio Company has no existence separate from the De Forest Company, except one of form. The Radio Company's employees work at benches in the De Forest Company shop designated as "Radio benches."

When the Radio Company bought apparatus from the Reynolds Spring Company, the bills were stamped paid by De Forest Company, because the Radio Company had no stamp for marking payment. The Radio Company has no production books; has no stock ledgers showing the apparatus on hand and parts of finished sets. The whole evi-

dence indicates an absorption by the De Forest Company of a beneficial interest in the license agreement granted to the Radio Company. Obviously a court of equity will look through the Radio Company's mantle of corporate existence and see that it is a cloak under which the De Forest Company seeks to hide its acts done in disregard of the Armstrong patent and the Radio Company's license. The Radio Company is in everything save "in its intangible and unsubstantial corporate entity" the De Forest Company. The license of the Radio Company could not be transferred to the De Forest Company. There is no difference between what the De Forest Company is doing and what it would have done had the license been transferred. The case is ruled by Westinghouse Electric & Mfg. Co. v. Allis-Chalmers Co., 176 Fed. 362, 100 C. C. A. 408, where Judge Buffington, in the Circuit Court of Appeals for the Third Circuit, said in granting an injunction restaining infringement:

"The substance of the matter is that the Allis-Chalmers Company is the unquestioned master, whose orders are obeyed, and we think that under such circumstances a court of equity may well look behind the corporate screen and determine where the real and responsible power lies."

See, also, Stockton v. Central R. R. Co., 50 N. J. Eq. 52, 24 Atl. 964, 17 L. R. A. 97, where Chancellor McGill looked at the substance, and not the outward form, and held that a corporation not authorized to assign its public franchise to a foreign corporation could not assign it to a New Jersey corporation, whose entire stock was owned and controlled by a foreign corporation. The facts in that case, and in the present, are subject to the caustic, but pertinent, lanugage of Vice Chancellor Kindersley in Attorney General v. Great Northern Rwy. Co., 1 Drew. & S. 157:

"A more flimsy device, when the particulars are once known, it is impossible to imagine. It may succeed for a time in baffling persons who may have an interest in preventing its being done and has succeeded, but it was a mere crafty contrivance to evade the requisition of the law."

So here the action of the De Forest Company was a mere crafty contrivance to evade the terms of the Radio Company's nontransferable license. The cases relied upon by the defendants do not vary the rule above stated and are in no sense opposed to the doctrine. They are all cases where the substance as well as the form of corporate existence had been preserved.

The complete absorption by the De Forest Company of the Radio Company is perhaps as well indicated by a letter of October 24, 1922, written by the De Forest Company to the Pacific States Electric Company shortly after acquiring the stock of the Radio Company, where the following statement is made:

"You probably have been wondering how we now sell regenerative sets. For your information we have purchased the Radio-Craft Company, one of the original licensees of Armstrong. This company has been purchased completely, and is owned by us, and is manufacturing in our plant. The regenerative sets D4 and D6, explained above, and the present MR6 set, connected regeneratively and selling for $112, will be sold by us under the name of the Radio-Craft Company at this address. We therefore are fully covered on this patent situation."

This letter clearly indicates what the De Forest Company had in mind when it acquired the stock of the Radio Company. On February 16, 1923, the president of the De Forest Company wrote, on stationery of the De Forest Company, to the Westinghouse Electric & Manufacturing Company a letter with respect to the royalties due on the Armstrong license of the Radio Company, in which he speaks of the license as *"our license."* He says that the appearance of the letter on the stationery of the De Forest Company and the signature of the De Forest Radio Telephone & Telegraph Company by himself, as president, was the result of an inadvertence of a new stenographer. Undoubtedly, this new stenographer could not distinguish with respect to a fiction contained in the minds of the officers of the De Forest Company with respect to what was the De Forest business and what was Radio business. This failure was due rather to a normal degree of intelligence than a lack of intelligence.

The defendant the De Forest Company cannot justify its acts under the Radio license. The plaintiff may have relief against the defendants.