GENERAL ELECTRIC CO. v. GEORGE J. HAGAN CO.

No. 1103.

District Court, W. D. Pennsylvania.
Nov. 14, 1929.

996

Byrnes, Stebbins, Parmelee & Blenko, of Pittsburgh, Pa., for plaintiff.

Green & McCallister, of Pittsburgh, Pa., for defendant.

McVICAR, District Judge.

This is a suit by the General Electric Company, a corporation of the state of New York, against the George J. Hagan Company, a corporation of the state of Pennsylvania. Plaintiff avers that it is the owner of Collins patent, No. 1,310,060, an improvement in electric resistance furnaces; that the defendant has infringed the same and prays for an injunction and an accounting. Defendant denies validity of the patent and infringement thereof. The court finds the following facts and conclusions of law.

### Findings of Fact.

1. Prior to the Collins patent of July 15, 1919, high temperature heat treatment work of large objects, such as guns and forgings, was done in fuel fired furnaces.

2. Fuel fired furnaces were objectionable on account of the amount of high skilled labor required, unsatisfactory results, and discomfort to workmen from the omission of noxious gases.

3. Prior to the Collins patent, carbon resistor furnaces had been used without success. In the carbon resistor type, for large production work, the carbon in the form of loose coke or graphite was shoveled into longitudinal troughs extending along the side portions of the furnace bottom. The current passed through this carbon resistance material, causing it to heat up. The difficulty with these furnaces, as shown by the record, was that the lower layer of carbon in the trench was raised to such a temperature that it melted the adjacent brickwork, this being aided by the passage of some current through the hot brickwork. As the fire brick raised in temperature, its resistance was lowered to a point where stray electric current wandered through it.

4. Beginning about twenty-five years ago, small metallic resistor electric furnaces came into use for laboratory work and to some extent for the heat treatment of small tools. These were first of the muffle type wherein the small resistance wire was wound around the outside of a fireclay or tile muffle or box, the tool being put inside the muffle. The heat was generated in the outer resistance wire and conducted through the fireclay or tile to the tool. While these were used to some extent, particularly for laboratory and small tool work, they were not commercially practicable for large work because the windings oxidized rapidly and burnt out, making the maintenance cost high. To give the desired hardening temperature of about 1500° F. to the tool, the windings must be subjected to a temperature several hundred degrees higher, due to the muffle effect. The wire was a nickel chromium alloy.

5. About 1910 or 1912, this muffle type of furnace was modified by grooving or slotting the interior wall of the muffle, and placing the winding of resistor wire in these grooves or slots. This improved these small tool treating furnaces somewhat, as a small part of the radiant heat passed direct to the work through the slot or groove openings into the interior, but the temperature of the resistor must still be much higher than the work and the heat was stored up in the muffle material causing heat "lag," and interferring with the automatic control of the temperature. The "muffle effect" was still present.

6. Also, about 1904 or 1905, electric ovens having metallic resistors came into use. This oven type of electric furnace was used for giving temperatures up to about 500°—600° F. and was used in preparing foods, in dry-

ing materials, in baking Japan, etc. Also, such furnaces were used for low temperature work (900° F.) on large articles, such as the shrinking of jackets and liners on large guns. These were found to be unsuitable for operations requiring temperatures above 900° F., and except for the shrinking furnaces, they were used only up to about 500° or 600°.

7. When the World War began, there was a demand for electric resistor production furnaces for high temperature work of 1500° F. or more, but no one, prior thereto, had discovered or invented such a furnace. Collins attempted to supply this demand, and he invented and built a furnace for the Midvale Steel Company for the hardening and drawing of projectiles. This was Collins' first step toward the invention of the patent in suit.

8. The Midvale Steel Company furnace was a cylindrical pit furnace about seven feet high and four feet outside diameter, lined with firebrick surrounded by heat insulation. On the bottom of this furnace was supported a metallic cagework consisting of metallic rings with intermediate vertical metallic struts. The rings had inwardly projecting studs on which were carried insulators. The metallic resistor was a round wire which was wound back and forth in vertical zig-zag loops between and over the insulators, each upper bend being supported by the upper insulators. The wire loops were inside of and free from the walls, and hence the "muffle effect" was small. There was one layer of resistors to each of the three rings, so that the radiant heat of the loop legs passed directly to the work. The projectile to be heat treated was lowered through the open top into the circular space inside the wire windings, and the top closed by a firebrick cover.

9. This furnace went into use in the spring or summer of 1918. It proved successful for drawing at about 1100° F., but it was unsuccessful for hardening at 1500° F. The furnace was therefore successful up to temperatures which had theretofore been practicable with metallic resistor furnaces. It failed at hardening temperature because the round wire did not have sufficient area of heat radiating surface. To get the 1500° F. temperature the resistor wire must be raised 300° or 400° F. higher than 1500° F. and rapidly burnt out. It became overloaded and failed. For this reason the furnace was finally abandoned and returned to plaintiff.

10. The demand for high-temperature electric resistor furnaces continued, and, in 1917, the government asked the General Electric Company, among other electrical manufacturers, to endeavor to produce an electric furnace suitable for the heat treatment of large gun forgings.

11. Plaintiff referred this matter to Collins, its chief engineer, who made the invention described in the patent in suit, which was assigned to the plaintiff.

12. In the application for the patent, Collins set forth on page 1 of the application, that

"The present invention relates to industrial electric resistance furnaces suitable for heat treating large objects, such as guns, engine shafts, large blocks and the like, at temperatures in some cases approximating the softening point of iron.

"It is the object of my invention to provide a furnace operable at high temperatures which is capable of efficient distribution of heat from the resistor to the work, without local overheating and in which the heating resistor and supporting parts are sufficiently rugged to permit the furnace to be operated under commercial conditions with a long life. My invention comprises a novel arrangement of the heater and support, as will be pointed out with greater particularity in the appended claims."

Twelve claims were made by Collins including Nos. 7 to 11, which are the claims involved in this suit, and which are as follows:

"7. An electric resistance furnace comprising an inclosing furnace wall, a ribbon-shaped resistor located to radiate heat to a charge within said furnace, current connections for said resistor and means for supporting said resistor adjacent the inner surface of said furnace wall and in position to freely expand and contract out of contact with said wall.

"8. An electric resistance furnace comprising a furnace wall, refractory supports mounted upon said wall and projecting away therefrom, a resistance heater having a plurality of bends and being gravitationally upheld at said bends by said supports and current connections for said heater.

"9. An electric resistance furnace comprising an inclosing furnace wall having a lining of refractory material, a sinuous ribbon-shaped resistor, current connections therefor, and means for supporting said resistor adjacent the inner wall of said furnace.

"10. An electric resistance furnace comprising an inclosing furnace structure having a lining of refractory material, and refractory members supported by the wall of said

furnace, a sinuous resistor supported at its bends by said members and located to radiate heat to a charge within said furnace and having sections between said bends in substantially a vertical position to permit free expansion and contraction of said resistor when subjected to temperature changes.

"11. An electric resistance furnace comprising an inclosure having a refractory lining, refractory supports extending away from said lining, and a refractory resistance heater having a plurality of bends and intervening straight portions upheld by said supports in effective heat radiating relation to a charge-receiving chamber in said furnace."

13. Collins, in this invention, overcame the defect in the Midvale Steel Company furnace, which defect included an insufficient heat emitting surface area resistor, by adopting a flat or ribbon-like resistor mounted edgewise to the wall.

14. Furnaces built in accordance with patent No. 1,310,060 were installed in the Inland Ordnance Company, Tioga Steel & Iron Company, Watertown Arsenal, and the Symington-Anderson Company plants.

15. These furnaces were operated during the War period. The furnaces at the Watertown Arsenal were continued in operation after the War, two of the furnaces being in operation at the present time.

16. The furnaces at the Tioga and Watertown plants operated satisfactorily. The furnaces at the Inland and Symington-Anderson plants gave considerable trouble, but were operated to the successful completion of large amounts of gun forgings during the War period.

17. Between four and five hundred furnaces embodying the Collins invention have been made by the plaintiff, its customers, and licensees.

18. An improvement in the invention contained in the Collins patent has since been made by the substitution of hanger bricks embedded in the furnace wall for supporting the resistor ribbons instead of insulators intermediately supported on the walls by metal rings. The Collins combination is present in this improvement.

19. The Collins invention has made a success of the modern electric high-temperature production furnace, and has enabled it to meet all modern heat-treating requirements and successfully compete with fuel-fired furnaces from the standpoint of rate of production.

20. Defendant, from 1910 until 1923, built furnaces embodying the Collins invention under an oral license with the plaintiff, which furnaces were built in accordance with the plaintiff's design.

21. In February, 1923, the plaintiff offered the defendant a written license under its furnace patents, including the patent in suit. Correspondence in relation thereto continued from February 28, 1923, to September 25, 1923. On the latter date, defendant refused plaintiff's offer of a license.

22. The bill in this case was filed May 8, 1924. On June 9, 1928, counsel stipulated in writing that this case may be retained on the docket until further motion of counsel. The delay in trying the case seems to have been caused by a mutual desire that a decision be made in a case, which had been tried in the United States Court for the Eastern District of Wisconsin, as the decision in that case might have a bearing on the decision in this case.

23. Defendant, from the expiration of the oral license, has made and has continued to make, until the present time, furnaces containing the elements of the Collins invention including the flat ribbon-like resistor mounted edgewise to the furnace wall.

24. Defendant's structure is shown in Plaintiff's Exhibits Nos. 2, 3, 4, and 5, which embody the following combined features:

(a) A high-temperature electric resistance furnace having an inclosing refractory furnace wall.

(b) Refractory supports carried upon such wall and projecting inwardly therefrom so as to extend substantially radially or at right angles to the wall.

(c) Ribbon-like resistors bent in zig-zag or sinuous form with each upper bend carried on one of such supports, the legs of each loop extending vertically and having free expansion and contraction under temperature differences.

(d) The ribbons being carried on the inwardly projecting supports are edgewise to the wall but out of contact therewith.

(e) The resistors supported, as above described, are in effective heat-radiating relation to the charge-receiving chamber of the furnace.

25. None of the prior patents introduced by defendant anticipates the Collins invention. Defendant's main references are Kohn patents, Nos. 1,057,743 and 1,187,630. The first is a muffle furnace. The second is said

to be an improvement on the first furnace, and is a semi-muffle furnace. Neither of these furnaces are suitable for high-temperature production work.

26. The elements of the Collins patent were individually old. The combination was new and this combination attained a new and improved result.

27. Defendant had knowledge of the Collins patent in 1919, and this knowledge continued down to the present time.

### Conclusions of Law.

1. While the elements of the patent in suit are old, the combination was patentable.

2. The various attempts to devise a high-temperature metallic resistor production furnace, including previous failures of the patentee, and the success of the patented furnace, are evidence of invention.

3. The combination of the patent in suit was not obvious, and involved invention.

4. Perfect operation of a patented device is not requisite for validity.

5. The claims in suit are not anticipated by the prior art.

6. The plaintiff has not been guilty of such laches as would create an estoppel.

7. The patentee did not abandon the invention set forth in claims 7, 8, 9, 10, and 11 of the patent in suit.

8. Claims 7, 8, 9, 10, and 11 of the patent in suit are valid.

9. The presence of additions or improvements to the basic Collins invention does not avoid infringement.

10. The defendant's furnaces embody the elements of the claims in suit, combined and co-operating in substantially the same way as therein set forth, to give the same results. Claims 7, 8, 9, 10, and 11 are therefore infringed.

### Opinion.

The findings of fact and conclusions of law render unnecessary an extended discussion.

Prior to the Collins' patent of July 15, 1919, there were no large high-temperature metallic resistor electric furnaces for high-temperature heat treatment of large forgings, guns, etc. The oil and gas combustion heated furnaces were not satisfactory. There was a demand from the United States, and the art for such furnaces. In response thereto, Collins, the chief engineer of the General Electric Company, invented such a furnace and procured the patent in suit, which was assigned to the plaintiff. The furnaces built under this patent embody the following features:

(a) A high-temperature electric resistance furnace having an enclosing refractory furnace wall.

(b) Refractory supports carried upon such wall and projecting inwardly therefrom so as to extend substantially radially or at right angles to the wall.

(c) Ribbon-like resistors bent in zig-zag or sinuous form with each upper bend carried on one of such supports, the legs of each loop extending vertically and having free expansion and contraction under temperature differences.

(d) The ribbons being carried on the inwardly projecting supports are edgewise to the wall but out of contact therewith.

(e) The resistors supported, as above described, are in effective heat-radiating relation to the charge-receiving chamber of the furnace.

The invention was a commercial success and the essential features thereof, including the carrying of the ribbon on inward projecting supports edgewise to the furnace wall, have been used in the large number of furnaces built by plaintiff, its licensees, and the defendant, from the date of the patent to the present time.

Are Claims Nos. 7 to 11 of the patent (which embrace the above features) valid? That the elements used were old does not negative invention. The combination in the Collins patent attained a new and improved result. In Boyer v. Keller Tool Co. (C. C. A.) 127 F. 130, 138, it is said:

"The mechanical elements combined are no doubt old, and so, to a certain extent, may be the result accomplished. But nowhere do we find the same combination employed to produce it, and the efficiency attained is so much in advance of that which had gone before as of itself to suggest, if it does not prove, the exercise of inventive skill. Sessions v. Romadka, 145 U. S. 29, 12 S. Ct. 799, 36 L. Ed. 609; Hobbs v. Beach, 180 U. S. 383, 21 S. Ct. 409, 45 L. Ed. 586; Taylor v. Sawyer Spindle Co., 75 F. 301, 22 C. C. A. 203; Stevenson v. McFassell, 90 F. 707, 33 C. C. A. 249; National Brake Beam Co. v. Interchangeable Brake Beam Co., 106 F. 693, 45 C. C. A. 544."

That there was a demand for such a furnace, that attempts had been made prior thereto without success to invent the same, and that the invention was a commercial suc-

cess, are evidences of invention. Temco Electric Motor Co. v. Apco Manufacturing Co., 275 U. S. 319, 324, 48 S. Ct. 170, 72 L. Ed. 298; Boyer v. Keller Tool Co., 127 F. 130, 137 (C. C. A. 3d).

The combination of the elements in the Collins patent was not obvious. It required more than mechanical skill and was, therefore, patentable. Consolidated Safety-Valve Co. v. Crosby Steam-Gauge & Valve Co., 113 U. S. 157, 5 S. Ct. 513, 28 L. Ed. 939; Boyer v. Keller Tool Co. (C. C. A. 3d) 127 F. 130, 137; Hildreth v. Mastoras, 257 U. S. 27, 42 S. Ct. 20, 66 L. Ed. 112; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Westinghouse Electric & Mfg. Co. v. Allis-Chalmers (C. C. A.) 176 F. 362; Allen v. Wingerter, 17 F. (2d) 745, 747 (3d C. C. A.).

It is not necessary to sustain the validity of the patent in suit to show that the device worked perfectly. In Hildreth v. Mastoras, 257 U. S. 27, 34, 42 S. Ct. 20, 23, 66 L. Ed. 112, it is said:

"It is not necessary, in order to sustain a generic patent, to show that the device is a commercial success. The machine patented may be imperfect in its operation; but if it embodies the generic principle and works, that is, if it actually and mechanically performs, though only in a crude way, the important function by which it makes the substantial change claimed for it in the art, it is enough. Telephone Cases, 126 U. S. 1, 535, 8 S. Ct. 778, 31 L. Ed. 863; Mergenthaler Linotype Co. v. Press Publishing Co. (C. C.) 57 F. 502, 505."

We conclude, for the reasons given, that the Collins patent is valid.

That improvement was made to the Collins patent does not avoid infringement. In Temco Electric Motor Co. v. Apco Manufacturing Co., 275 U. S. 324, 328, 48 S. Ct. 170, 173, 72 L. Ed. 298, it is said:

"It is well established that an improver cannot appropriate the basic patent of another, and that the improver without a license is an infringer, and may be sued as such. Cochrane v. Deener, 94 U. S. 780, 787, 24 L. Ed. 139; Cantrell v. Wallick, 117 U. S. 689, 694, 6 S. Ct. 970, 29 L. Ed. 1017; Yancey v. Enright (C. C. A.) 230 F. 641, 647; Reed v. Hughes Tool Co. (C. C. A.) 261 F. 192, 194."

Defendant claims that the bill should be dismissed because of plaintiff's unreasonable delay in asserting its rights under the patent in suit. This contention cannot be sustained. Defendant operated under, an oral license from the plaintiff from 1919 until 1923. Correspondence in relation to a renewal continued from February 8, 1923, until September 25, 1923, at which time defendant refused to take a license from the plaintiff. The bill was filed May 8, 1924. The delay since that time was caused by the desire of the parties to receive a decision in a case said to be analogous, which is pending in the United States court for the Eastern District of Wisconsin. Either party could have brought this suit to a hearing within a short time if it had desired to do so.

Defendant also claims that the bill should be dismissed because:

"That the patentee Collins abandoned the alleged invention purporting to be set forth by the claims of the patent in suit (claims 7 to 11) by his delay in asserting such claims; and by his failure to include such or similar claims in his earlier issued patent 1,281,521 of October 15, 1918; and by his failure to include such claims in the patent in suit until after a radically different development by Callaghan, which is defined by Callaghan patent No. 1,490,732."

Claims Nos. 7 to 11 inclusive, were inserted by amendment, which was supported by oath. This amendment was properly made, Heller Bros. Co. v. Crucible Steel Co. of America (C. C. A.) 297 F. 39, 41, 43; Diamond Power Specialty Corp. v. Bayer Co., 13 F. (2d) 337, 339 (C. C. A. 8th); Bowers v. San Francisco Bridge Co., 69 F. 640 (C. C. N. D. Calif.); Karl Kiefer Mach. Co. et al. v. Unionwerke, A. G., 218 F. 847, 857 (D. C. S. D. N. Y.); Wells et al. v. Honigmann, 50 App. D. C. 99, 267 F. 743; (Court of Appeals of District of Columbia). The Collins patent, No. 1,281,521, did not contain a disclosure on which the claims in suit could be based.

Holding as we have, that the Collins patent, No. 1,310,060, is valid and has been infringed by the defendant, let a decree be prepared and submitted in accordance with the findings of fact, conclusions of law, and this opinion.